# EXHIBIT 1

Laura Marquez-Garrett (SBN 221542)
laura@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
1390 Market Street, Suite 200
San Francisco, CA 94102
Ph: 206-294-1348

Kevin M. Loew (SBN 238080)
kloew@waterskraus.com
WATERS, KRAUS & PAUL
222 North Pacific Coast Hwy, Suite 1900
El Segundo, California 90245
Telephone: (310) 414-8146
Facsimile: (310) 414-8156

Attorneys for Plaintiffs

ELECTRONICALLY
**F I L E D**
*Superior Court of California,
County of San Francisco*

**10/06/2022**
**Clerk of the Court**
BY: JEFFREY FLORES
Deputy Clerk

# IN THE SUPERIOR COURT OF THE STATE OF CALIFORNIA

# FOR THE COUNTY OF SAN FRANCISCO

| | |
|---|---|
| **C.U.** and **S.U.**,<br><br>        Plaintiffs,<br><br>    vs.<br><br>**META PLATFORMS, INC.,** *formerly known as* **FACEBOOK, INC.; SNAP, INC.; ROBLOX CORPORATION; DISCORD INC.,** and **DOES 1-100, INCLUSIVE,**<br><br>        Defendants. | Case No.:   **CGC-22-602249**<br><br>**COMPLAINT FOR PERSONAL INJURIES**<br><br>**JURY DEMAND** |

COMES NOW PLAINTIFFS C.U. and S.U. and allege as follows:

"In these digital public spaces, which are privately owned and tend to be run for profit, there can be tension between what's best for the technology company and what's best for the individual user or for society. Business models are often built around maximizing user engagement as opposed to safeguarding users' health and ensuring that users engage with one another in safe and healthy ways.  . . . Technology companies must step up and take responsibility for creating a safe digital environment for children and youth. Today, most companies are not transparent about the impact of their products, which prevents parents and young people from making informed decisions and researchers from identifying problems and solutions."

*Protecting Youth Mental Health,* The U.S. Surgeon General's Advisory (December 7, 2021)

Plaintiffs C.U. and S.U. bring this action for personal injuries against and loss of consortium against Meta Platforms, Inc., formerly known as Facebook, Inc., Snap, Inc., Roblox Corporation, and Discord Inc. for injuries caused to each of them because of S.U.'s use of the Facebook, Instagram, Snapchat, Roblox, and Discord social media products and allege as follows:

## I.      INTRODUCTION

1.      This product liability action seeks to hold Defendants' products responsible for causing and contributing to the burgeoning mental health crisis perpetrated upon the children and teenagers of the United States by Defendants and, specifically, for the harms caused to 13-year-old S.U. and her family, beginning when she was only 10 years old, from use of and exposure to Defendants' unreasonably dangerous and defective products.  Those harms include but are not limited to addiction, sleep deprivation, anxiety, depression, self-harm, suicidal ideation, exploitation and abuse, and attempted suicide.

2.      On December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises including suicides, attempted suicides, eating disorders, anxiety, depression, self-harm, and inpatient admissions. While the most significant and far-reaching change to the lives of young people during this period was the launch and light speed growth of certain social media platforms, most prominently for purposes of this litigation lawsuit,

      a.   The Facebook product, founded in 2004 but not made available to everyone until September 2006, and designed and distributed by Meta.

      b.   The Instagram product, launched in 2010, acquired by Facebook (now Meta) in 2012, and designed and distributed by Meta.

      c.   The Snapchat product, launched in 2011 and designed and distributed by Snap, Inc.

      d.   The Roblox product, launched in 2006 and designed and distributed by Roblox Corporation.

      e.   The Discord product, launched in 2015 and designed and distributed by Discord Inc., a privately held company.

3.      Plaintiffs' harms are a symptom of this current mental health crisis among American youth caused by these Defendants – which comes as no surprise to Defendants Meta or Snap. From the beginning, Defendants Meta and Snap have exploited vulnerabilities in human psychology to addict users and maximize user time and engagement. Meta's first President, Sean Parker, summed up the devastating impact of these social media designs in a 2017 interview:

> God only knows what it's doing to our children's brains. The thought process that went into building these applications, Facebook being the first of them, ... was all about: "How do we consume as much of your time and conscious attention as possible?" And that means that we need to sort of give you a little dopamine hit every once in a while, because someone liked or commented on a photo or a post or whatever. And that's going to get you to contribute more content, and that's going to get you ... more likes and comments. It's a social-validation feedback loop ... exactly the kind of thing that a hacker like myself would come up with, because you're exploiting a vulnerability in human psychology. The inventors, creators — it's me, it's Mark [Zuckerberg], it's Kevin Systrom on Instagram, it's all of these people — understood this consciously. And we did it anyway.[1]

4.      By 2014, 80 percent of high school students said that they used a social media platform daily, and 24 percent reported being online "almost constantly."

5.      Millions of U.S. children and teenagers check their social media accounts hundreds, if not thousands, of times every day, and spend hours on Defendants' products to the point of extreme exhaustion and sleep deprivation. Millions of teenagers also want to quit using Defendants' products but feel as though they cannot. These children and teens are so locked-in to Defendants' products that they harm themselves and/or put themselves in harms' way when their parents attempt to limit or remove access.

6.      Peer reviewed studies and the available medical science have identified social media use as a cause of major mental health injuries among youth. Large observational studies and experimental results point to such use as the cause of sleep deprivation, anxiety, depression, anger, eating disorders, suicidal ideation, and suicide and self-harm. More to the point, at least some of these defendants have conducted their own internal studies and/or observations, which reach the same conclusions.

---

[1] Mike Allen, Sean Parker unloads on Facebook: "God only knows what it's doing to our children's brains", Axios (November 9, 2017), https://www.axios.com/2017/12/15/sean-parker- unloads-on-facebook-god-only-knows-what-its-doing-to-our-childrens-brains-1513306792.

7.     Defendants have invested billions of dollars to design and develop their products to encourage, enable, and push content to children and teenagers that Defendants know to be problematic and highly detrimental to their minor users' mental health.

8.     Defendants' products contain unique product features which are intended to and do encourage addiction, and unlawful content and use of said products, to the detriment of their minor users.

9.     Defendants target and market their products to children and teens, design their platforms around sunk cost and network effect principles – which designs are not known to ordinary and reasonable consumers – for the express purpose of locking in minor users so that they continue to use Defendants' products, no matter the cost to those same minor users' health and well-being. In fact, Defendants know the cost to those minor users which is why most (if not all) of Defendants' principals and designers severely restrict and/or prohibit the use of these products by their own children. Plaintiffs can think of no other industry where product manufacturers have gotten away with marketing and distributing to kids, while being too afraid of the product they are making to let their own kids use it; much less while repeatedly representing to the public and even to Congress in sworn testimony (as Defendants Meta and Snap have done) that their products are not addictive, and that they utilize all available technologies to keep kids safe.

10.    Plaintiffs bring claims against all Defendants of strict liability based upon Defendants' defective design of their products that renders such products not reasonably safe for ordinary consumers or minor users. It is technologically feasible to design social media products that substantially decrease both the incidence and magnitude of harm to minors arising from their foreseeable use of Defendants' products with a negligible increase in production cost.

11.    Plaintiffs also brings claims against all Defendants for strict liability based on Defendants' failure to provide adequate warnings to minor users and their parents of the danger of mental, physical, and emotional harms and sexual abuse arising from foreseeable use of their products. The addictive quality of Defendants' products and the impacts of their harmful algorithms and direct messaging and public profile features, among others, are unknown to minor users and their parents.

12. Plaintiffs also brings claims for common law negligence against all Defendants arising from Defendants' unreasonably dangerous social media products and their failure to warn of such dangers. Defendants knew, or in the exercise of ordinary care should have known, that their social media products were harmful to a significant percentage of their minor users and failed to redesign their products to ameliorate these harms or warn minor users and their parents of dangers arising out of the foreseeable use of their products.

13. Plaintiffs bring claims under California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code, §§17200, *et seq.* against Defendants Meta and Snap. The conduct and omissions alleged herein constitute unlawful, unfair, and/or fraudulent business practices prohibited by the UCL.

14. Plaintiffs also bring a claim for unjust enrichment against Defendants Meta and Snap. Defendants Meta and Snap received a direct benefit from problematic and harmful use of their product. Under the circumstances stated herein, it would be unjust and inequitable for them to retain those ill-gotten benefits.

15. Plaintiffs bring claims for invasion of privacy against Defendants Meta and Snap. Defendants' conduct detailed herein frustrated and intruded upon Plaintiff S.U.'s fundamental rights to protect her child and to monitor and control her child's use of social media, and this intrusion occurred in a manner that was highly offensive to a reasonable person.

16. Finally, Plaintiff brings claims under 47 U.S.C. § 1595 as against Defendant Snap based on Defendant Snap's financial benefit derived from knowingly assisting, supporting, and facilitating the sexual solicitation and exploitation of S.U. and similarly situated children. Defendant Snap has actual knowledge of, and knowingly benefits from, the large number of adult users who regularly use and are actively encouraged by its product features to solicit and groom minor users to engage in commercial sex acts. To be clear, these Defendants all have actual knowledge that adult predators use their social media platforms and products to facilitate commercial sex acts. And these Defendants publicly claim and tout their products as having technologies that enable them to prevent and detect sexual abuse and exploitation occurring on their platforms aimed at and/or involving minor users. Yet these Defendants also have historically

utilized such technologies selectively and in a manner that prioritizes their own economic interests over the safety of the minors to whom they provide access to their products.

17.     Defendant Snap has designed and markets its product in an inherently dangerous manner and has actual knowledge that its product design assists, supports, and facilitates sexual exploitation and solicitation. Yet Snap purposefully failed to undertake reasonable efforts to redesign its product to protect minor users such as S.U. from sex abuse; failed to warn minor users and their parents that predators are using Snapchat to recruit minors to perform commercial sex acts; failed to prevent predators from using its product in that manner, including where Snap had actual knowledge that this is how those predators were using its product; and failed to notify law enforcement despite knowledge of illegal sex acts performed on and through its product.

## II.     PARTIES

18.     Plaintiff C.U. is S.U.'s parent and legal guardian. S.U. is currently 13 years old and began suffering harms caused by Defendants' products before she turned 13, and without her mother's knowledge or consent.

19.     C.U. has not entered into a User Agreement or other contractual relationship with any of the Defendants herein in connection with S.U.'s use of their social media products, and further disaffirms all "agreements" that her child may have entered with Defendants. As such, Plaintiffs are not bound by any arbitration, forum selection, choice of law, or class action waiver set forth in any such "agreements."

20.     Defendant Meta Platforms, Inc., formerly known as Facebook, Inc., is a Delaware corporation with its principal place of business in Menlo Park, CA. Defendant Meta Platforms owns and operates the Instagram social media platform, an application that is widely available to users throughout the United States.

21.     At all times relevant hereto, Defendant Meta Platforms, Inc. was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Meta Platforms, Inc.

22.     Defendant Snap, Inc. is a Delaware corporation with its principal place of business in Santa Monica, CA. Defendant Snap owns and operates the Snapchat social media platform, an

application that is widely available to users throughout the United States.

23. At all times relevant hereto, Defendant Snap, Inc. was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Snap, Inc.

24. Defendant Roblox Corporation is a Delaware corporation with its principal place of business in San Mateo, CA. Defendant Roblox owns and operates the Roblox social media platform, an application that is widely available to users throughout the United States.

25. At all times relevant hereto, Defendant Roblox Corporation was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Roblox Corporation.

26. Defendant Discord Inc. is a Delaware corporation with its principal place of business in San Francisco, CA. Defendant Discord owns and operates the Discord social media platform, an application that is widely available to users throughout the United States.

27. At all times relevant hereto, Defendant Discord Inc. was acting by and through its employees, servants, agents, workmen, and/or staff, all of whom were acting within the course and scope of their employment, for and on behalf of Discord Inc.

## III. JURISDICTION AND VENUE

28. This Court has personal jurisdiction over Defendants because Defendants all have their principal places of business in California and are "at home" in this State.

29. Venue is proper in San Francisco County because Discord is headquartered there.

## IV. FACTUAL ALLEGATIONS

30. In late 2021, a Facebook whistleblower disclosed thousands of internal Meta documents to the United States Securities Exchange Commission (the "SEC") and Congress. The Facebook Papers prove known dangerous designs and design defects as well as operational decisions and calculations, and a causal relationship between use of Defendants' various social media products in their current form and resulting addiction, anxiety, depression, eating disorders, exploitation and grooming, and what Meta internally refers to as "SSI" (Suicide and Self Injury). While the Facebook Papers originate from Meta, they prove known dangerous designs and design

defects as well as other dangers caused by the social media products of these Defendants.[2]

31.    Defendants have knowledge about the harms their products cause users, particularly teen, child, and other vulnerable user populations, and all Defendants continue to operate those products in a harmful and dangerous manner anyway and in the interest of competing with one another and increasing already astronomical profits. Meta is simply the only one whose documents have been disclosed; even then, Plaintiffs anticipate literal truckloads of additional evidence that will support these claims and show precisely what these social media designers and distributors have done in the name of corporate greed.

32.    These Defendants are making calculated cost-benefit business decisions and are consistently prioritizing their already astronomical profits over human life.

**A.    Roblox and its Roblox Product**

33.    Roblox owns and operates the Roblox product, which was launched in 2006, and functions as an online "metaverse" in which users control avatars of themselves.

34.    In Roblox's words, the company "operates a human co-experience platform . . . where users interact with each other to explore and develop immersive, user generated, 3D experiences." Roblox 10-Q, *supra*, at 10 (pdf pg. 12). But also, the Roblox product is marketed to and designed in a manner intended to appeal to children. Roblox is a kid's game.

35.    Roblox is essentially a digital sandbox where kids can build their own games—anything from a simulation of running a virtual restaurant to adopting a pet.  The entire platform is made up of user-generated games, many of them created by children and teens. And unlike other gaming products, Roblox is aimed primarily at children under the age of 13.[3]

36.    "The roughly hewn, blocky aesthetics and ugly text that typified most user-made games on the platform were off-putting to adults.  But children loved the fact Roblox offered access to an endless stream of new and free experiences—a kind of YouTube for video games.  Best of

---

[2] Examples of the Facebook papers have been published by the Wall Street Journal (https://digitalwellbeing.org/the-facebook-files-on-instagram-harms-all-leaked-slides-on-a-single-page/), Gizmodo (https://gizmodo.com/facebook-papers-how-to-read-1848702919), and other publishers, and have been disclosed to the SEC, Congress, and others on a global scale. Plaintiffs expressly incorporate all such documents into this Complaint by reference, which are central and material to certain of Plaintiffs' claims.

[3] Shannon Liao, *How Roblox became the 'it' game for tweens—and a massive business*, CNN Business, Oct. 29, 2020, https://www.cnn.com/2020/10/27/tech/roblox-explainer/index.html

all, one's customized avatar could be used in any game on the platform—as if Super Mario could also moonlight as the hero in *FIFA Football*, *Call of Duty* or *Pac-Man*, a feature that made thousands of disparate games feel like part of the same universe."[4]

37.     Roblox claims that it is one of the most popular gaming products among American teens and children. "If you're a tween, there's a very good chance you're playing Roblox.  About 75% of American children ages 9 through 12 play Roblox regularly with friends, according to the company.  During the pandemic, kids flocked to Roblox to throw virtual birthday parties and other in-game events that were no longer as safe to hold in-person.  In July [2020], gamers spent 3 billion hours playing Roblox, twice as much time as in February."[5]

38.     Further, a December 2017 study by Comscore found that kids between the ages of 5 and 9 spend more time playing Roblox than doing anything else online on PCs; for those between the ages of 9 and 18, only YouTube consumes more of their online attention.[6]

39.     Roblox also marketed its product as educational and encouraged integration of its product into several kid-focused organizations and activities. For example, "Schools, camps, Girl Scout troops and many other organizations use Roblox to teach kids coding.  And it has become a quasi-social-network for children."[7]

40.     Roblox generates the bulk of its revenue by selling its users in-game currency, called "Robux," which users can then spend on virtual items for their avatars. *See Doe v. Roblox Corp.*, No. 3:21-cv-03943-WHO, at 1 (N.D. Cal. May 5, 2022).

41.     On information and belief, this means that although Roblox is marketed to and designed for children under 13, it relies disproportionately on the engagement and loyalty of teen

---

[4] Simon Parkin, *The trouble with Roblox, the video game empire built on child labour*, The Guardian, Jan. 9, 2022, *available at* https://www.theguardian.com/games/2022/jan/09/the-trouble-with-roblox-the-video-game-empire-built-on-child-labour ("Roblox was built as a playful method of teaching children the rudiments of game-making").
[5] Shannon Liao, *How Roblox became the 'it' game for tweens—and a massive business*, CNN Business, Oct. 29, 2020, https://www.cnn.com/2020/10/27/tech/roblox-explainer/index.html
[6] *See, e.g.*, Burt Helm, *Sex, lies, and video games: Inside Roblox's war on porn*, Fast Company, Aug. 19, 2020, *available     at*     https://www.fastcompany.com/90539906/sex-lies-and-video-games-inside-roblox-war-on-porn; https://www.businessofapps.com/data/roblox-statistics/ ("Roblox highest demographic is children under 13 and it was the most popular entertainment app for that age group").
[7] *Id.*

and adult users – who more often have assets and ability to make significant in-game purchases.[8]

42.     Roblox reported its recent Form 10-Q that most of its revenue comes from a small percentage of its users: "We generate substantially all of our revenue through the sales of our virtual currency, 'Robux,' which players can use to purchase virtual items sold by our developer and creator community on the platform.  Only a small portion of our users regularly purchase Robux through subscriptions and pay for experiences and virtual items compared to all users who use our Platform in any period.  We rely on our developers to develop engaging content where users elect to purchase digital items to enhance their enjoyment."[9]

43.     This structure creates a conflict for Roblox, as the product targets minor users but the revenue generating product features may dis-incentivized Roblox from changing its product in a way that might discourage participation by high-spending adult users – even where the current design is defective and/or inherently dangerous to the same minor users Roblox targets.

44.     S.U. was under 13 when she began using the Roblox product, which Plaintiff and millions of other parents understood to be a children's game that was safe and appropriate for children under the age of 13.

45.     Roblox claims to be safe and appropriate for children under 13.

46.     Roblox started "with the premise that most of its users were underage, so it put safeguards in place to protect children from online harassment and predators.  It has long been wildly popular with children, particularly those between 9 and 12 years old."[10]

47.     Roblox represents that it has and utilizes advanced technologies to, "identify problematic language, potential bypasses to our chat filters, and content that falls outside our policies" and "review and monitor communications that flow through Roblox to block and protect users from inappropriate behavior, such as questions about personal information and instructions on how to connect on less protective third-party chat applications." Roblox also represents that the

---

[8] *See, e.g.*, *https://digitalmediatreatment.com/in-game-purchases/*; https://www.thegamer.com/roblox-players-spent-over-100-million-in-may/ (Roblox generated more than $102.9 million in May of 2020 alone, based on its mobile players and not including players via Xbox and PC).

[9] *See* Roblox Corporation, Form 10-Q, March 31, 2022, *available at* https://d18rn0p25nwr6d.cloudfront.net/CIK-0001315098/ea0f0408-7ea4-48f8-a127-fef1fdb69aa3.pdf, at 59.

[10] Kellen Browning, *Roblox, the Gaming Site, Wants to Grow Up Without Sacrificing Child Safety*, N.Y. Times, Oct. 31, 2021, *available at* https://www.nytimes.com/2021/10/17/business/roblox-child-safety.html

"The algorithms in our chat filters are age-sensitive: they monitor both what users can say and see based on their ages."[11]

48.     Roblox also touts the fact that it employs more than 2,000 "moderators" globally to actively review and address harmful and/or inappropriate content, for the specific purpose of keeping its underage users safe.

49.     In 2020, for example, Roblox reported that it has "a team of 1,600 moderators who monitor the platform for inappropriate content and conduct safety reviews of all images, audio and video files using humans and machine scanning." Shannon Liao, *How Roblox became the 'it' game for tweens—and a massive business*, CNN Business, Oct. 29, 2020, https://www.cnn.com/2020/10/27/tech/roblox-explainer/index.html. Roblox CEO and Co-Founder, David Baszucki, touted Roblox's "stringent safety system," calling it "one of the most rigorous of any platform, going well beyond regulatory requirements. *Id.*

50.     In November 2021, Roblox CEO and Co-Founder, David Baszucki, assured investors and/or shareholders that safety was at the core of everything the company built.  It was, he said, "what everything rests on," and he represented that Roblox employs more than 2,000 moderators around the world who review content uploaded to the platform, manually check anything flagged as inappropriate and escalate incidents of suspected grooming.[12]

51.     At the same time, Roblox's director of community safety and digital civility is reported as having stated that "You can't retrofit safety."  *Id.*

52.     On information and belief, Roblox knew or should have known of certain product defects and/or inherently dangerous product features, which Roblox designed and operated, and which Roblox could have fixed at minimal time and expense. Roblox failed to act, however, at least in part because it knew that such product changes might curb its explosive growth.

//

---

[11] Roblox Corporation 2021 Annual Report and 2022 Proxy Statement, May 26, 2022, *available at* https://s27.q4cdn.com/984876518/files/doc_financials/2021/ar/Roblox_Proxy-and-Annual-Report_Web-Ready_Bookmarked-(1).pdf , at 16 (pdf page 83).

[12] Simon Parkin, *The trouble with Roblox, the video game empire built on child labour*, The Guardian, Jan. 9, 2022, *available at* https://www.theguardian.com/games/2022/jan/09/the-trouble-with-roblox-the-video-game-empire-built-on-child-labour

53.     At all times relevant, while Roblox was designed and marketed for children, like S.U., Roblox designed products and product features that provided adults users with unfettered access to children. Roblox knows the age of its users and, during the time frame at issue, failed to take reasonable steps to warn parents and children of the dangers of these product features – products like the Roblox direct and/or instant messaging ("direct messaging") feature as well as in-game features that allow children to transfer and receive currency from complete strangers.

54.     At all times relevant, Roblox could have taken reasonable steps to better protect their underage users generally and S.U., specifically, including, for example, (a) by not allowing use of its direct messaging product between minor users and adult users, (b) by not allowing adult users to initiate messaging with minors or to message with minors at all, unless such contact is approved by the minor user's parent, (c) by warning parents of the direct messaging product feature and of Roblox's failures to create the safe environment it promised, (d) or by notifying parents every time their minor child engaged in direct messaging with another user (particularly an adult user), and/or by providing a transcript of all direct message to parents. These are just *some* examples of steps Roblox could have taken to warn users of known dangers and to prevent those harms from occurring because of design defects and dangerous product features.

55.     Roblox was aware of the dangers its direct messaging and in-game currency features posed to minors, like S.U.  Roblox could have taken steps to protect minor users – for example, by prohibiting direct messaging and similar product-related communication tools to be utilized between minors and adult users not approved by their parents.

56.     Roblox could have made these changes at nominal time and expense, and further, direct messaging products are not necessary to operation of the Roblox game. Instead, Roblox failed to warn, and marketed its product as safe and fun for kids, when it knew or had reason to know that it was not safe for a significant number of its child users, including S.U.

57.     In addition to the above issues, there are several product changes Roblox could have made at nominal time and expense to make its product less dangerous for its minor users. This includes but is not limited to things like, verifying age and identity (as well as parental approval) in order to block access to child users by adult users unknown to them in real life,

requiring identification and contact information, as well as an exchange of emails, between users and minor user parents before any contact is allowed, and any number of other product design changes that could and would protect Roblox's minor users, and would have prevented the harms caused to S.U. in this case by adult Roblox users who were encouraged and enabled by Defendant Roblox in their exploitation and abuse of her.

**B.      Discord and its Discord Product**

58.     Discord launched in 2015 and is an instant messaging and Voice over Internet Protocol (VoIP) platform that allows users to communicate with voice calls, video calls, text messaging, media, and files in private chats or as part of communities called "servers." https://en.wikipedia.org/wiki/Discord.

59.     Discord operates, essentially, as a series of chat rooms and groups that users can join to engage in conversations with other users.

60.     By default, all users—including users under 18—can receive friend invitations from anyone in the same server, which opens the ability for them to send and receive private messages from strangers. Samantha Murphy Kelly, *The dark side of Discord for teens*, CNN Business, Mar. 22, 2022, https://www.cnn.com/2022/03/22/tech/discord-teens/index.html.

61.     Discord also allows people to chat using fake names, and the task of ensuring that people follow its community standards is largely left up to the organizers of individual Discord servers.  Kellen Browning, *How Discord, Born From an Obscure Game, Became a Social Hub for Young People*, N.Y. Times, Dec. 29, 2021, *available at* https://www.nytimes.com/2021/12/29/business/discord-server-social-media.html.

62.     Moreover, while Discord's terms of use prohibit users under 13, it is commonly known and understood that nobody follows that rule and that Discord allows underage users on its social media product. Discord does not verify age or identity and allows multiple accounts. Discord users also can attach a profile photo to their account and a bio, and minor users often state their real age in their bio and/or tell other users their real age in group chats. Likewise, the photos they post often reflect their actual age.

63.     Discord users often tell other users their real age in public and private chats, and

there are children as young as eight years old currently using the Discord social media product. *See* Kellen Browning, *5 Ways Young People Are Using Discord*, N.Y. Times, Dec. 29, 2021.

64.     Discord does not make its money via advertisements. Instead, it generates revenue through a subscription service that gives users access to features like custom emojis for $5 or $10 per month.  Discord also began experimenting in December 2021 with allowing some users to charge for access to their server, up to $100 a month, of which the company takes a 10 percent cut. Kellen Browning, *How Discord, Born From an Obscure Game, Became a Social Hub for Young People*, N.Y. Times, Dec. 29, 2021, *available at* https://www.nytimes.com/2021/12/29/business/discord-server-social-media.html.

65.     Discord also claims to have implemented safety measures geared toward protecting harm to minors, specifically, the types of harms understood by social media companies like the ones at issue in this complaint as arising from distribution to minors and adult users of unrestricted direct messaging products.  Specifically, on March 28, 2017, Discord announced the addition of the Safe Direct Messaging feature. https://discord.com/blog/discord-safety-boost

66.     This product feature was in place prior to S.U.'s first use of Discord.

67.     When users sign up for an account and/or as accessible via account settings, they choose what safety setting Discord will apply to their messaging capabilities. In this way, Discord's "Safe Direct Messaging" product is a modification to its previously existing direct messaging product which, again, functions essentially the same as all Defendants' direct messaging product in that it can be used to provide adult users with unsupervised and unfettered access to minors for purposes of exploitation and abuse.

68.     The Discord support page explains its "Safe Direct Messaging" product as follows:

Keep me safe: The safest option. This will have Discord scan any image sent in all DMs, regardless of whether you've added the user on your friend list, or the user is DMing you just by sharing a mutual server.

My friends are nice: The medium-est option! This will let Discord know to scan any images sent in DMs from users that aren't on your friends list, but also to trust your previously-added friends and not worry about any images they send.

Do not scan: The self-confident option. Enabling this option will completely disable Discord's image scanning process, and leave you for a walk on the wild side for any and all DMs you receive. Careful, it's a jungle out there!

Discord Safety: Safe Messaging!, https://support.discord.com/hc/en-us/articles/115000068672-Discord-Safety-Safe-Messaging-

69.     Discord's direct messaging and Safe Direct Messaging product features are inherently defective and/or dangerous in the case of minor users because Discord should not be presenting less-safe product options to users under 18 without their parents' knowledge and consent. Presenting these options to minors and without verification of parental consent (for minor users) is a product defect and/or inherently dangerous because Discord is attempting to contract with minors without warning to minor parents and in a manner that poses significant risk to a significant number of its minor users. Discord (and all defendants) should be required to design direct messaging products with safety settings and to set those to the safest possible setting for all minor accounts, absent parental consent.

70.     But also, Discord's Safe Direct Messaging product is defective and/or does not operate as promised and as reasonably understood by Discord's minor users. This product does not operate as promised and as reasonably understood by Discord's minor (and even adult) users and creates a false sense of safety that results in direct harm and incredible harm to a significant number of Discord's minor users. Most persons reviewing this product description (including but not limited to children like S.U.) reasonably would understand Discord's representations to mean that Discord will keep them "safe" from harmful interactions and predatory users, including by monitoring and saving conversations had via Discord's social media product and as long as the user selects the "Keep me safe" option. While Discord's product does nothing of the sort or even similar. On information and belief, Discord only scan's image files for malware and similar issues and does not look at the content of images or of any text-only messages.

71.     It is a reasonable assumption based on Discord's representations that Discord is at the very least looking at the content of images to protect those of its users who select the "Keep me safe" option, rather than Discord simply looking for malware attached to an image. However, the "Keep me safe" option is essentially blind to anything but malware.  This product and Discord's representations lull users, particularly children, into a false and dangerous sense of security.

//

72.     S.U. was 9 or 10 when she opened her first Discord account, at the urging of adult Roblox users. When she opened the account and received Discord's safety settings options for direct messaging, she understood those statements to mean that an adult (at Discord) would have knowledge of any discussions she had via Discord's messaging features and would keep her safe. She understood it to mean that she would be safe engaging in conversations on Discord with the strangers she had met because of the Roblox product and told herself that she did not need to even tell her parents about these conversations because Discord would keep her safe and would intercede if anything harmful happened. S.U. selected the "Keep me safe" option when she first opened her Discord account and changed that to a lower setting months later – after the abuses were long underway.

73.     Discord's product and product setting selection process is deceptive and misleading, it is also defective as it does not actually keep Discord users safe, and it is inherently dangerous in the case of minor Discord users because it creates a false sense of security and encourages them to use the Discord product under the belief that it is safe.

74.     S.U. believed based on Discord's specific product features and representations to her that she would be safe, and that someone would intercede if she was not. Discord did not, however, act on the information it had and harms it knew or should have known about and that were occurring to S.U. because of her use of its social media product without her parents' knowledge or consent. Over the last two years, S.U. has submitted multiple requests to Discord for copies of her conversations – data that, based on the Discord "Keep me safe" product descriptions, Discord still has – to which requests Discord has not yet responded.

**C.     Defendants' Meta and Snap and Their Social Media Products**

       **a.   Meta and its Facebook and Instagram Products**

75.     Meta, founded in 2004, is the world's largest social media company, and its motto until recently was "Move Fast and Break Things," while Instagram began as a simple photo-sharing application, which Meta purchased in 2012.

76.     When Meta began, access to its products were limited to college students, with email and/or domain verification to confirm the same.

77.     In September 2006, Meta opened Facebook up to everyone. It claimed that it provided access only to persons 13 and older, and that users under 18 should obtain parental consent. But it also stopped verifying age or identity, to the point where Meta did not even verify existence of a valid email address – meaning that underage users enter nonsense email addresses and Meta provides access to limitless Facebook and Instagram accounts. These product changes were good for Meta's bottom line but resulted in the complete absence of any safety features for children and teens.

78.     In 2009, Meta launched the "like" button product and, in 2011, it launched Facebook Messenger. By 2012, when Meta acquired the Instagram social media product, it was making rapid and significant changes to all its social media products – including Facebook and Instagram – which changes focused entirely on increasing engagement at any cost. This included product changes, as well as changes in data collection and advertising policies and procedures; essentially any change Meta could think up that might bolster engagement and revenue, particularly among children and teens, and create greater addiction and network effects features to ensure that those users would be locked-in to its social media products for years to come – but at the expense of user safety and autonomy.

79.     To name only one example, in 2014, Meta applied for just one of its many patents for new processes and systems Meta was developing in connection with its recommendation technologies. Patent No. 9,798,382, Systems and methods of data and eye tracking analysis, relates specifically to the eye tracking processes Meta intends to use or uses in connection with its content recommendation systems (a/k/a algorithms). Meta has denied current use of this patented technology. It is unknown whether Meta's representations on this point were accurate, but regardless, it is worth noting that this patented technology would permit, among other things, tracking of eye movements, pauses, etc. This means, for example, that if someone pauses on offensive content because it is *offensive* but has no desire to view or otherwise engage with the content, as evidenced by the fact that they do not like, react to, or share the offensive content, Meta could use the fact of the pause to identify and push similar content to them anyway. Meta has no concern for consent, only engagement, and it is unclear whether Meta is using or will use this tech

and in what manner.

80.     Meta has also patented its Newsfeed product, *see* U.S. Patent No. 8,171,128, "Communicating a newsfeed of media content on a member's interactions in a social network environment" (filed August 11, 2006, granted May 1, 2012). The patent "describes keeping a profile of each person on the social network in a database, identifying relationships between said users, generating 'stories' based on the connections, and then creating a News Feed for each user."[13] Millions of users, including Plaintiff, have been harmed by Meta's patented technologies, which Meta utilizes in its Facebook and Instagram social media products.

81.     In 2015 and 2016, Meta made other changes to its Facebook and Instagram content recommendation technologies, including programming its products for engagement rather than user interest or safety; and implementing a multitude of other technologies meant to help Meta determine what might catch each user's attention, irrespective of what the user requested or wanted to see, including utilization of user data in connection with activities undertaken *off* the Facebook and Instagram social media products. Meta removed any modicum of user control and did so behind closed doors.

82.     With the knowledge that teen and child users were Meta's only opportunity for growth in the United States, Meta also ramped up its marketing to children and teens – including and specifically to children under the age of 13. It designed several new products and re-designed several old ones on its Facebook and Instagram platforms, launched and marketed games and emojis, and became significantly more involved with content creation. It also made it easier for kids to hide accounts and switch between accounts on a single device and, at one point, launched a campaign to ensure that all teens knew of their ability to open multiple accounts.

83.     Meta also continued finding new ways to monetize user content and the users themselves, including development of incredibly complex and invasive advertising products, tools,

---

[13] *See* https://www.zdnet.com/article/facebook-patents-the-news-feed/; *see also, e.g.* https://info.ipvisioninc.com/blog/4-creepy-facebook-patents-that-are-actually-real (discusses various, invasive social media products for which Meta has obtained patents, which Meta may or may not be using on its users – which information is known only to Meta); https://www.forbes.com/sites/nicolemartin1/2018/11/20/facebook-files-algorithm-patent-to-predict-who-you-live-with/?sh=3b987fe73544 (discussing Facebook patent application to use algorithms to determine who lives in the same household);

and technologies – which have made Meta billions in revenue on an annual basis, at the expense of Meta's users, including minor S.U.

84.     Throughout these product changes, re-designs, and launches, Facebook founder and CEO, Mark Zuckerberg, made public statements assuring the world that safety was Meta's top priority. For example, in February of 2017, he made a post on his personal Facebook titled "Building Global Community," in which he talked at length about how Meta is focused on safety, how it intends to use its AI to the fullest to keep users safe, and how amazing Facebook is for bringing communities together, promoting critically important social groups, and other statements that we now know to be untrue, and profoundly dangerous, given what was actually happening at Facebook and what Mr. Zuckerberg knew about the harms his products were causing American youth.

85.     By 2017, however, Meta employees were already reporting to management that Facebook was causing harmful dependencies. Meta was studying and purposefully designing its products in a manner that required sunk cost and system effects that would ensure its ability to lock-in its young users – that is, to make sure that they would never leave. Meta was marketing to children under 18, as well as children under 13 despite clear legal mandates that it could not knowingly allow children under 13 on its social media products. And Meta leadership, Mark Zuckerberg himself, was actively rejecting proposed re-designs and fixes that would have minimized the harms Meta's products were actively causing to children and teen users, users like minor S.U. Meta failed to act because engagement was its first priority and teens and children its primary target for acquisition – Meta had long since identified teens as its key to success, including because teen users could influence and encourage their younger brothers and sisters to use Meta's products.

86.     Meta also creates images and GIFs for users to post on their videos and pictures in connection with its Facebook and Instagram products. Meta has also acquired publishing rights to thousands of hours of music, which it provides to its users to attach to the videos and pictures that they post on Facebook and/or Instagram. The GIFs, images, and music are integral to the user's post and are, in fact, designed to encourage posting. Indeed, in many cases, the only content in a

user's post is the image, GIF or music supplied by Meta. When users incorporate images, GIFs, and music supplied by Meta into their postings, Meta is functioning as a co-publisher of such content. A Facebook and/or Instagram user who incorporates images, GIFs or music supplied by Meta into their post is functionally equivalent to a novelist who incorporates illustrations into their story. Instagram can no longer characterize the images, GIFs, and music it supplies to its users as third-party content, just as the novelist cannot disclaim responsibility for illustrations contained in their book. Meta has made the deliberate decision to collaborate with its users in this regard and, as evidenced by Meta's internal documents, Meta's decision is motivated by the fact that such collaboration results in increased engagement, advertising revenue, and other profits for Meta itself.

87.     Meta also has ownership and/or licensing, and other legal, rights in all third-party content, such that it is not "third-party content" at all. To name only one example, in 2012, Meta revised its Instagram Terms of Service to the following,[14]

> To help us deliver interesting paid or sponsored content or promotions, you agree that a business or other entity may pay us to display your username, likeness, photos (along with any associated metadata), and/or actions you take, in connection with paid or sponsored content or promotions, without any compensation to you.

88.     Its current terms (effective January 4, 2022) are different, but still grant Meta the right to use all third-party content at Meta's sole and unilateral discretion and in connection with all its social media products.

89.     Meta directly profits from the videos and pictures its users create in collaboration with Meta, as described above.

90.     Meta knows that it is harming teens yet, when faced with recommendations that would reduce such harms, Meta's leadership consistently opted for prioritization of profit over the health and well-being of its teen users.

91.     Meta knows that underage users are on its platform and has deliberately designed its product in a manner intended to evade parental authority and consent, including but not limited

---

[14] https://www.theverge.com/2012/12/18/3780158/instagrams-new-terms-of-service-what-they-really-mean

to Meta's failure to verify age and identity, provision of multiple accounts, marketing aimed at informing minors that they can open multiple accounts, failure to provide a point of contact for parents to notify Meta of lack of consent, marketing aimed at children and that encourages children to use Meta's social media product without consent, and multiple other features and conduct by Meta aimed at ensuring young users have a means to access Meta's social media products no matter the circumstances.

92.     The Facebook and Instagram products are used by many millions of children every day, children who have become addicted to these Meta products because of its design and product features, children like S.U., to the point where parents cannot remove all access to these products without self-harm, suicide, and other foreseeable consequences of serious addiction, and where such cessation of use would require professional intervention.

**b. Snap and its Snapchat Product**

93.     Snapchat was founded in 2011, by three Stanford college students, and was originally called *Pictaboo*.  It started as a simple app with the idea that it would be nice to be able to send photos to friend that would disappear. Months after its launch, *Pictaboo* had only amassed 127 users,[15] however, so it changed its name to Snapchat and began marketing to and targeting high school students. Within a year, and with its new target audience of children and teens, Snapchat grew to more than 100,000 users.

94.     The Snapchat product became well-known for its self-destructing content feature. Specifically, the Snapchat product allows users to form groups and share posts or "Snaps" that disappear after being viewed by the recipients. However, the Snapchat social media product quickly evolved from there, as its leadership made design changes and rapidly developed new product features intended to and that did increase popularity among minors.

95.     In 2012, Snap added video capabilities to its Snapchat product, pushing the number of "snaps" to 50 million per day; in 2013, "Stories" and "Chat" features; in 2014, live video chat capabilities, text conversations, "Our Story," Geofilters, and Snapcash; in 2015, Discovery, QR code incorporation, and facial recognition software; in 2016, Memories and Snapchat Groups.

---

[15] *See* https://frozenfire.com/history-of-snapchat/

96.     By 2015, advertisements were pervasive on Snapchat and, by 2018, 99% of Snap's total revenue came from advertising, according to internal company records. In other words, Snap decided to monetize its userbase and, from that point forward, began changing its product in ways that made its product even more harmful to users but that paved the way for growth, engagement, and profits for Snap and its leadership and investors,

97.     Snap also patents certain of its social media technologies, for example only (*see* https://patents.justia.com/assignee/snapchat-inc),

**Content delivery network for ephemeral objects**
**Patent number:** 9237202
**Abstract:** A computer implemented method includes receiving an object scheduled for automatic deletion after a specified viewing period, a specified number of views or a specified period of time. Object push criteria are evaluated. The object is pushed to an edge server cache in response to evaluating. The object is served in response to a request for the object.
**Type:** Grant
**Filed:** October 8, 2014
**Date of Patent:** January 12, 2016
**Assignee:** Snapchat, Inc.
**Inventor:** Timothy Sehn

**Prioritization of messages within gallery**
**Patent number:** 9430783
**Abstract:** In some embodiments, a computer implemented method of processing messages may include creating a gallery using messages received from user devices; scanning the messages to identify a selected message of messages; receiving, from an owner of the brand, a prioritization of the selected message; prioritizing, in response to the prioritization, the selected message in the gallery; and supplying the gallery to a user device for display to a user of the user device.
**Type:** Grant
**Filed:** July 24, 2015
**Date of Patent:** August 30, 2016
**Assignee:** Snapchat, Inc.
**Inventor:** Timothy Michael Sehn

98.     By 2015, Snapchat had over 75 million monthly active users and was the most popular social media application amongst American teenagers in terms of number of users and time spent using the platform. Snapchat is now one of the most widely used social media products in the world and is used by more than 69% of all U.S. teens (age 13 to 17).[16] Snap estimates having between 92.8 and 96.6 million users in the U.S., at least 17 to 17.7 million of which are under the age of 18. Against this backdrop, Snap advertises and promotes its product as safe and fun—which

---

[16] *See* https://www.smartinsights.com/social-media-marketing/social-media-strategy/snapchat-statistics/

1    could not be further from the truth.

2       99.     Snap also markets and advertises specifically to minors. For example, one Snapchat

3   commercial is titled "Real Friends" and reads, "we talked to thousands of people around the world

4   about their Real friends, then features Snap users talking about how their friends developed on

5   Snap, followed by avatars (cartoons) of each,



100.     A second Snapchat commercial highlights fun filters, which feature is particularly

appealing to children and teens,



101.     And a third Snapchat commercial starts with two toys (a ghost and robot) entering

a Snaps booth,



It reads "Happy Snapping! Enjoy the new, faster Snapchat, rebuilt just for Android" and then features various goofy photo booth pictures,



102.   Snapchat cannot claim, in good faith, that its commercials and advertisements are not aimed at children and teens.

103.     Snapchat offers several unique messaging and data features. It is perhaps most famous for its self-destructing content design feature, which appeals to minors and makes it more difficult for parents to monitor their children's social media activity. This is an inherently dangerous product feature both because it deprives parents of any way to monitor or control usage by their children – seemingly a blatant violation of Section 230(d) – but also, because it encourages and allows minor uses to exchange harmful, illegal, and sexually explicit images with adults, and provides those same adults with a safe and efficient vehicle to recruit victims.

104.     Snapchat is a go-to application for sexual predators because of its features,[17] and adult predators will often encourage or convince children to open Snapchat accounts and/or provide them with their Snapchat account usernames so that they can utilize Snap's product in this way. A common phrase on other social media products is "What's your Snap?"

105.     For years Snap has received reports of child abuse and bullying occurring through its product and because of its product features,[18] yet has kept those features in place as removing them would result in considerable impact on the popularity of Snap's social media product. Harmful and dangerous interactions likewise occur because of these and other Snapchat messaging features, which provide direct and unsupervised access to children and teens.

106.     But also, Snapchat is a dangerous product because it does not operate as advertised. Snap's disappearing design and marketing of this feature is particularly harmful to teens who rely on Snap's representations when taking and sending photos, only learning after the fact that recipients have means to save photos – and are often bullied, exploited, and/or sexually abused as a direct result. These are harms known to Snap.

107.     Snap has also developed images for users to decorate the pictures or videos they post, and Snap has developed Lenses which are augmented reality-based special effects and sounds for users to apply to pictures and videos users post on Snapchat, and World Lenses to augment the environment around posts. Snap also has acquired publication rights to music, audio, and video

[17] *See, e.g.*, https://phonespector.com/blog/what-are-the-dangers-of-snapchat-to-avoid/
[18] *See, e.g.*, https://www.forbes.com/sites/zakdoffman/2019/05/26/snapchats-self-destructing-messages-have-created-a-haven-for-child-abuse/?sh=411b8e1d399a (Snapchat Has Become A 'Haven for Child Abuse' With Its 'Self-Destructing Messages').

content that its users can incorporate in the pictures and videos they post on Snapchat. These images, Lenses, and licensed audio and video content supplied and created by Snapchat frequently make a material contribution to the creation or development of the user's Snapchat posts. Indeed, in many cases, the *only* content in a user's Snapchat post are images, Lenses, and licensed audio and video content supplied and created by Snapchat. When users incorporate images, Lenses, music, audio, and video content supplied by Snapchat posts, Snapchat makes a material contribution to the creation and/or development of their Snapchat postings and becomes a co-publisher of such content. When malign users incorporate images, Lenses, music, audio, and video content supplied by Snapchat to their posts, this enhances the psychic harm and defamatory sting that minor users experience from third-party postings on Defendant's platform.

108.    Moreover, Snap contracts for legal rights in this third-party content, such that it is not "third-party content" at all. Snap's current Terms of Service grant Snap several, sweeping sets of legal rights, from licensing to ownership, as follows (and for example only as there are several provisions in Snap's Terms of Service that address legal rights over user content, comments, and other usage and activities),

### 3. Rights You Grant Us

Many of our Services let you create, upload, post, send, receive, and store content. When you do that, you retain whatever ownership rights in that content you had to begin with. But you grant us a license to use that content. How broad that license is depends on which Services you use and the Settings you have selected.

For all content you submit to the Services, you grant Snap and our affiliates a worldwide, royalty-free, sublicensable, and transferable license to host, store, cache, use, display, reproduce, modify, adapt, edit, publish, analyze, transmit, and distribute that content. This license is for the purpose of operating, developing, providing, promoting, and improving the Services and researching and developing new ones. This license includes a right for us to make your content available to, and pass these rights along to, service providers with whom we have contractual relationships related to the provision of the Services, solely for the purpose of providing such Services.

109.    Snap directly profits from the videos and pictures and other content its users create in collaboration with Snap, as described above.

//

110.    Snap knows that it is harming teens yet consistently opts for prioritization of profit over the health and well-being of its teen users.

111.    The Snapchat product is used by many millions of children every day, children who have become addicted to the product a result of its design and product features, children like S.U., to the point where parents cannot remove all access to the Snapchat product without self-harm, suicide, and other foreseeable consequences of serious addiction, and where such cessation of use would require professional intervention.

> ### c.    Defendants Meta and Snap's Business Models are Based on Maximizing User Screen Time

112.    Defendants Meta and Snap advertise their products as "free" because they do not charge their users for downloading or using their products. What many users do not know is that, in fact, Defendants make a profit by finding unique and increasingly dangerous ways to capture user attention and target advertisements to their users. Defendants receive revenue from advertisers who pay a premium to target advertisements to specific demographic groups of users in the applications. Defendants also receive revenue from selling their users' data to third parties.

113.    The amount of revenue Defendants receive is based upon the amount of time and level of user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user.

114.    Defendants use unknown and changing rewards that are designed to prompt users who consume their social media products in excessive and dangerous ways. Defendants know, or in the exercise of ordinary care should know, that their designs have created extreme and addictive usage by their minor users, and Defendants knowingly or purposefully designed its products to encourage such addictive behaviors. This design conforms to well-established principles of operant conditioning wherein intermittent reinforcement provides the most reliable tool to maintain a desired behavior over time.

115.    Instagram and Snapchat are designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards, including

"likes" and "followers" as well as features like "Streaks," "Trophies," "Charms," and "Snap Scores." In the hands of children, this design is unreasonably dangerous to the mental well-being of underage users' developing minds.

116.    According to industry insiders, these Defendants have employed thousands of psychologists and engineers to help make their products maximally addicting. For example, Instagram's "pull to refresh" is based on how slot machines operate. It creates an endless feed, designed to manipulate brain chemistry and prevent natural end points that would otherwise encourage users to move on to other activities.

117.    Again, the amount of revenue Defendants Meta and Snap s receive is based upon the amount of time and user engagement on their platforms, which directly correlates with the number of advertisements that can be shown to each user. In short, Meta and Snap opted for user engagement over the truth and user safety.

118.    Meta and Snap know that their products are addictive, and that millions of teen users want to stop using them but cannot.

119.    Meta and Snap engineer their products to keep users, and particularly young users, engaged longer and coming back for more. This is referred to as "engineered addiction," and examples include features like bottomless scrolling, tagging, notifications, and live stories, in addition to other product features discussed above.

120.    Meta and Snap spend billions of dollars marketing their products to minors and have deliberately traded in user harm for the sake of their already astronomical revenue stream.

**d.  Meta and Snap Designed Complex Recommendation Technologies to Addict Teen Users**

121.    Meta and Snap have intentionally designed their products to maximize users' screen time, using complex algorithms designed to exploit human psychology and driven by the most advanced computer algorithms and artificial intelligence available to some of the largest technology companies in the world.

122.    Meta and Snap's recommendation systems select content for minor users not based on what they anticipate the user will prefer or to enhance their social media experience, but rather

for the express purpose of habituating users to the Defendants' social media products. Defendants' algorithms do not provide a neutral platform but rather specify and prompt the type of content to be submitted and determine particular types of content its systems promote.

123.    In the words of one, high-level departing Meta employee:

> In September 2006, Facebook launched News Feed. In October 2009, Facebook switched from chronological sorting to an algorithmic ranking. 10 years later, in July 2019, Sen. Josh Hawley introduced a bill to the US Senate that would ban features in app feeds, such as infinite scroll.
>
> The response in 2006 was largely positive; the response in 2009 was negative from a vocal minority, but still largely positive; the response in 2019 was largely "lol, wut?" If I had to guess, the response to government regulation around engagement centric information feeds in 2026 will be "Omg finally".

"Why We Build Feeds" (October 4, 2019), at p. 1.[19]

124.    Defendants designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use.

125.    One of these features—present in Instagram and Snapchat—is the use of complex recommendation systems to select and promote content that is provided to users in an unlimited and never-ending "feed," or similar distribution product feature. Defendants are aware that algorithm-controlled feeds promote unlimited "scrolling"—a type of use those studies have identified as detrimental to users' mental health—however, this type of use allows Defendants to display more advertisements and obtain more revenue from each individual user.

126.    Defendants also know that content that generates extreme psychological reactions in minor users is more likely to trigger their engagement than content that is benign. Defendants have designed algorithm-controlled feeds to promote content most likely to increase user engagement, which often means content that Defendants know to be psychologically stressful to their users. Content is selected not just based on individual users' viewing history but also on the viewing history of their linked friends. Users are exposed to massive amounts of content that they would otherwise never see but for Defendants' affirmative pushing of the content to their accounts.

---

[19] https://www.documentcloud.org/documents/21600853-tier1_rank_exp_1019

127.    The addictive nature of Meta and Snap's products and the complex and psychologically manipulative design of their algorithms is unknown to ordinary consumers, particularly minors.

128.    Defendants go to significant lengths to prevent transparency, including posing as a "free" social media platform, burying advertisements in personalized content, and making public statements about the safety of their products that simply are not true.

129.    Defendants also have developed unique product features designed to limit, and have in other ways limited, parents' ability to monitor and prevent problematic use by their children.

130.    Defendants' addiction-driven algorithms adapt to the social media activity of individual users to promote *whatever* content will trigger a particular user's interest and maximize their screen time. That is, prior to the point when Meta and Snap have addicted their users and are then able to influence user preferences, their algorithm designs do not distinguish, rank, discriminate, or prioritize between types of content. For example, if the algorithm can increase User One engagement with elephants and User Two engagement with moonbeams, then Defendants' algorithm design will promote elephant content to User One and moonbeam content to User Two. These types of algorithms are solely quantitative devices and make no qualitative distinctions between the nature and type of content they promote to users.

131.    Meta and Snap's algorithms are not simply tools meant to facilitate the communication and content of others but are products in and of themselves. Defendants' algorithms do not function like traditional search engines that select content for users based on user inputs; they direct minor users to content based on far more than the individual users' viewing history. Defendants' algorithms make recommendations not simply based on minor users' voluntary actions but also the demographic information and social media activity of the users' friends, followers, and cohorts. The user data that Defendants' algorithms use to select content therefore encompasses far more information than voluntarily furnished by a particular user and include private information about the user that Defendants discover through undisclosed surveillance of user behavior both online and, at least in the case of Defendant Meta, offline.

//

**e.** **Minor Users' Incomplete Brain Development Renders Them Particularly Susceptible to Manipulative Algorithms with Diminished Capacity to Eschew Self-Destructive Behaviors and Less Resiliency to Overcome Negative Social Media Influences**

132.    The human brain is still developing during adolescence in ways consistent with adolescents' demonstrated psychosocial immaturity. Specifically, adolescents' brains are not yet fully developed in regions related to risk evaluation, emotional regulation, and impulse control.

133.    The frontal lobes—and in particular the prefrontal cortex—of the brain play an essential part in higher-order cognitive functions, impulse control, and executive decision-making. These regions of the brain are central to the process of planning and decision-making, including the evaluation of future consequences and the weighing of risk and reward. They are also essential to the ability to control emotions and inhibit impulses. MRI studies have shown that the prefrontal cortex is one of the last regions of the brain to mature.

134.    During childhood and adolescence, the brain is maturing in at least two major ways. First, the brain undergoes myelination, the process through which the neural pathways connecting different parts of the brain become insulated with white fatty tissue called myelin. Second, during childhood and adolescence, the brain is undergoing "pruning"—the paring away of unused synapses, leading to more efficient neural connections. Through myelination and pruning, the brain's frontal lobes change to help the brain work faster and more efficiently, improving the "executive" functions of the frontal lobes, including impulse control and risk evaluation. This shift in the brain's composition continues throughout adolescence and into young adulthood.

135.    In late adolescence, important aspects of brain maturation remain incomplete, particularly those involving the brain's executive functions and the coordinated activity of regions involved in emotion and cognition. As such, the part of the brain that is critical for control of impulses and emotions and for mature, considered decision-making is still developing during adolescence, consistent with the demonstrated behavioral and psychosocial immaturity of juveniles.

//

136.     The recommendation technologies in Meta and Snap's social media products are designed to exploit minor users' diminished decision-making capacity, impulse control, emotional maturity, and psychological resiliency caused by users' incomplete brain development. Defendants know, or in the exercise of reasonable care should know, that because their minor users' frontal lobes are not fully developed, they experience enhanced dopamine responses to stimuli on Defendants' social media platforms and are therefore much more likely to become addicted to Defendants' products; exercise poor judgment in their social media activity; and act impulsively in response to negative social media encounters. Defendants also know, or in the exercise of reasonable care should know, that minor users of their social media products are much more likely to sustain serious physical and psychological harm through their social media use than adult users. Nevertheless, Defendants knowingly designed their social media products to be addictive to minor users and failed to include in their product design any safeguards to account for and ameliorate the psychosocial immaturity of their minor users.

137.     Moreover, Meta and Snap designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use. Defendants' product features are designed to be and are addictive and harmful in themselves, without regard to any content that may exist on Defendants' platforms.

138.     For example, Defendants "like" and "follow" features are content neutral and have nothing to do with the content or material a user sees.

139.     Defendants also have developed and modified product features like the continuous loop feed and push notifications, to incentivize users to stay on the product as long as possible and to convince users to log back on. Defendants even calculate the most effective time to send such notifications, which in the case of young users often means in the middle of the night and/or during school hours. Essentially, the times they are least likely to have access to Defendants' social media products, which also—as Defendants know—are the times that their health and well-being necessitate them not being on Defendants' social media product.

//

//

### f. Defendants Meta and Snap Misrepresent the Addictive Design of Their Social Media Products

140.    Meta and Snap do not warn users of the addictive design of their products. On the contrary, they actively conceal the dangerous and addictive nature of their products, lulling users and parents into a false sense of security. This includes consistently playing down their products' negative effects on teens in public statements and advertising, making false or materially misleading statements concerning product safety, and refusing to make their research public or available to academics or lawmakers who have asked for it.

141.    Defendants have repeatedly represented to the public and governments around the world that their products are safe and not addictive.

142.    During the relevant time period, Defendants stated in public comments that their products are not addictive and were not designed to be addictive. Defendants knew or should have known that those statements were untrue.

143.    During the relevant time period, Defendants advertised via commercials and/or third parties that their products were fun and safe to use, and that Defendants employed their technologies to ensure safe and age-appropriate experiences. Defendants knew or should have known that those statements were untrue.

144.    Defendants did not warn users or their parents of the addictive and mentally harmful effects that the use of their products was known to cause amongst minor users. On the contrary, Defendants have gone to significant lengths to conceal and/or avoid disclosure as to the true nature of their products.

145.    Defendants have denied for years that their products are harmful or addictive while, in fact, their products *are* harmful and addictive. Defendants knew the truth and chose to conceal it and not disclose to the public or parents of young users, as Defendants knew that such disclosure would prevent them from further growth and development of these products and product features.

### D.    Defendants' Products are Products.

146.    Roblox, Discord, Instagram, and Snapchat are products that are designed and manufactured by Roblox, Discord, Meta, and Snap, respectively. These products are designed to

be used by children and are actively marketed to children throughout the world.

147.    Defendants' products are designed to be used by minors and are actively marketed to minors across the United States. Defendants market to minors through their own marketing efforts and design.

148.    But also, Defendants Meta and Snap work with and actively encourage advertisers to create ads targeted at and appealing to teens, and even to children under the age of 13. Defendants Meta and Snap also spend millions of dollars researching, analyzing, and experimenting with young children to find ways to make their products more appealing and addictive to these age groups, as these age groups are seen as the key to Defendants' long-term profitability and market dominance.

149.    Defendants are aware that large numbers of children under the age of 18 use their products without parental consent. They design their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

150.    Defendants are aware that large numbers of children under the age of 13 use their products despite user terms or "community standards" that purport to restrict use to individuals who are 13 and older. They have designed their products in a manner that allows and/or does not prevent such use to increase user engagement and, thereby, their own profits.

151.    Defendants Meta and Snap refer to their social media products and product features as "products," and further, go to great lengths and expense to patent several aspects of their algorithms and other technologies – which patents Defendants could not obtain for abstract ideas and/or speech.

**E.    Defendants Designed and Distributed Inherently Dangerous and/or Defective Products to Minors and Failed to Warn**

152.    Defendants Meta, Snap, Roblox, and Discord's products contain countless features that serve no critical purpose relating to product functionality or a user's ability to access other users' content.  While this complaint addresses known features, on information and belief, there are countless other features currently unknown to Plaintiffs for the simple reason that these Defendants have concealed the truth and operate with zero transparency. Upon information and

belief, it is in the public interest for this Court to permit discovery of all such product features and processes. The following describe just some such features and defective designs.

153.  Defendants Meta, Snap, Roblox, and Discord design their products to evade parental consent and control.

154.  Defendants Meta, Snap, and Discord claim to impose age restrictions for use of their products, including that users must be at least 13 and must or should obtain parental consent if under the age of 18.  Nevertheless, Defendants Meta, Snap, and Discord provide access to millions of minors who are under 13, or under 18 and lack parental consent. Defendants know or should know that these users are not duly authorized but provide them with access regardless and because Defendants view children and teens as valuable assets. Defendants have turned a blind eye in the name of corporate profit.

155.  For example, in the case of Defendant Meta, Meta has and utilizes technologies that can ascertain the actual age of each user (referred to by Meta as the approximate or estimated age) with reasonable certainty. In the United States (where Meta can collect personal and private data to an unprecedented degree), Meta uses these technologies for assessment and advertising purposes. Such use results in internal documents and assessments of underage users, including users at least as young as 10 years old. Despite having actual data confirming the existence of underage users (children who do not belong on Meta's platforms), Meta takes no action – it takes no action because it is making considerable sums of money from these unauthorized (if not unlawful) accounts.

156.  Less is known about the other defendants' technologies, however, on information and belief, Defendants Snap and Discord also have actual knowledge of underage users and refuse to act (unless forced) to secure their fortunes.

157.  Defendants Meta, Snap, Roblox, and Discord design their products to encourage and aid users' evasion of parental oversight—such as with Defendant Snapchat's self-destructing content design feature—and do not notify parents concerning the amount of time their children spend on their platforms, what hours of the day they are connected, or when they are contacted or solicited by adults. Defendants do not verify emails or phone numbers, permit and encourage

multiple accounts (with the knowledge that children use these multiple account features to hide accounts from their parents), and otherwise refuse to enforce their age limitations in any reasonable or meaningful manner.

158. To the extent applicable, Defendants' public profile settings are inherently dangerous and defective when utilized in connection with minor users. Public profile settings allow strangers to view and message underage users, which Defendants determined to be good for engagement. However, this means that they are exposing children to strangers in a manner against which parents cannot protect. Each of these defendants could set all minor accounts to private by default and, even better, each of these defendants could restrict all minor accounts to private until the user reaches the age of majority in his, her, or their state.

159. Public default settings are unnecessary and serve no critical purpose as to product functionality or a user's ability to access content posted by other users. They do, however, encourage and provide adult users the ability to identify and access, minors for the purpose of sexual abuse and exploitation—a dangerous defect known to these Defendants.

160. Defendants Meta, Snap, Roblox, and Discord's direct messaging and recommendation technologies are inherently dangerous and defective when utilized in connection with minor users.

161. Defendants Meta, Snap, Roblox, and Discord direct-messaging products provide other users—including anonymous and semi-anonymous adult users, bullies under the age of eighteen, and any other stranger for whom a parent would not allow access—with unrestricted and unsupervised access to minor users. Minor users lack the cognitive ability and life experience to identify online grooming behavior by prurient adults and the psychosocial maturity to decline invitations to exchange salacious material and mass-messaging capabilities. Defendants' products further allow direct messaging with and by minors without parental notification.

162. Defendants Meta, Snap, Roblox, and Discord's direct messaging products are unnecessary and serve no critical purpose as to product functionality or a user's ability to access content posted by other users. They are, however, incredibly profitable in terms of engagement and retention of teen users; as well as engagement and retention of adult users who want access to

vulnerable children and teens outside the purview of their parents.

163.   Each of these defendants could restrict direct messaging products so that minor users could only send or receive direct messages with persons approved by their parents and/or already on their "friend" list or equivalent. They chose to not do so for economic reasons – their economic reasons, not those of their users.

164.   Defendants Meta and Snap also employ recommendation technologies, affirmatively sending recommendations to users regarding people or groups they should "friend," join, or otherwise connect. In Defendant Snapchat's case, for example only, this is called "Quick Add." Defendant Meta calls this "People You May Know" for its Facebook product. Whatever the name, these technologies function in a similar (if not the same) manner. Specifically, user data and other information obtained through Defendants' data collection technologies (including information such as age and gender) affirmatively directs users to one another, and pushes messages recommending that the users connect, follow, friend, or otherwise.

165.   Defendants know that these user recommendation technologies facilitate and contribute to most of the adult/minor grooming and exploitation that occurs on their platform. In Meta's case, the estimate is upwards of 75%. To be clear, this means that Defendants' technologies, processes, and related devices are affirmatively finding, recommending, and connecting predatory adult users to vulnerable minors, the Defendants know their technologies is causing these harms, and that Defendants continue to utilize these technologies regardless and because they are otherwise good for Defendants' business.

166.   Moreover, each of the above products is dangerous alone, but they are substantially more dangerous when combined. For example, Defendants' direct-messaging products are more dangerous when coupled with minor accounts of which parents have no knowledge (or means to monitor) and do not consent; and when combined with Defendants' public profile and recommendation features.

167.   Defendant Snapchat's ephemeral messaging feature is also dangerous because it encourages predators to move conversations over to Snapchat where they know it will be harder for them to get caught because of the disappearing messages feature—with the danger

compounded by the fact that messages do not always disappear. That is, Snapchat's ephemeral messaging feature is inherently deceptive and dangerous, as is Snap's advertising of this feature, as it lulls users into a false sense of security – for example, many young users, once convinced to send salacious pictures, agree only to do so via Snapchat and with the belief that the photo will disappear. Instead, they are often bullied, extorted, and otherwise harassed, abused, and embarrassed as a result. In some cases, this exact scenario has led to the foreseeable consequence of suicide, yet Snap continues to market it product to children as one where messages disappear.

168.    The above direct-messaging and recommendation features connect complete strangers who would otherwise have no contact, but they serve no purpose as to platform functionality or the ability to access content posted by others.  They do, however, increase Defendants' engagement (and profits) by serving up photos of minors to complete strangers and then providing those same complete strangers with unsupervised access to those minors.

169.    Defendants Meta and Snap also design countless addictive product features, which features are meant to result in user dependencies, particularly among minors. Defendants Meta and Snap know that these features are addictive, in many cases have been asked to fix and/or remove such features, and in all cases have chosen profits over user safety and wellbeing. These addictions among U.S. children and teens are an epidemic, and a deadly one at that.

170.    Defendants Meta and Snap's selection and recommendation technologies select content for minor users for the express purpose of habituating users to the Defendants' social media products.  These technologies create addiction in minor users on a content-neutral basis by adapting to promote whatever content will trigger minor users' engagement and maximize their screen time.  Defendants have purposely designed their products to increase users' engagement, and refuse to redesign their products, despite their knowledge of severe user harm resulting from this design.

171.    Defendants Meta and Snap have purposely designed their products to be as addictive as possible and have actual knowledge of the harm these addictive features cause.

172.    Defendants Meta and Snap use unknown and changing rewards that are designed to prompt users who use their products in excessive and dangerous ways.  Defendant Meta and

Snap knowingly or purposely designed their products to encourage addictive behaviors. For example,

    a.   Instagram is designed around a series of features that do not add to the communication utility of the application, but instead seek to exploit minor users' susceptibility to persuasive design and unlimited accumulation of unpredictable and uncertain rewards. Examples of this include but are not limited to "likes," "followers," algorithm-controlled feed, and unlimited scrolling features.

    b.   Snapchat features a series of rewards including trophies, streaks, and other signals of social recognition. These variable and unknown reward and reminder systems are particularly addictive, especially in the case of children and teens. Other product examples include recommendation technologies and unlimited scrolling features.

173. The Snap Streak feature is unique to Defendant Snap's product and is one of the most – if not the most – addictive products available "especially to teenagers."[20] Snap knows that its Snap Streak product is addictive and has known for years but continues to provide that product to teens and children.

174. Defendant Meta performed extensive testing on its "like" button feature. Meta determined that its "like" product feature is a source of social comparison harm for many of its users. This is not surprising given that several of the Meta employees involved in creating that feature have since left Meta and have spoken publicly about the product's addictive nature and harmfulness.[21] What is unacceptable, however, is that Meta knows that its product feature is harmful, particularly to teens and young adults, and could easily hide or remove that product feature. But does not, for fear that hiding "likes" would result in lower engagement and less advertising revenue. This is a blatant example of Defendant Meta choosing its own profits over human life and, specifically, the health and well-being of a significant number of teens, including

---

[20] *See* https://abcnews.go.com/Lifestyle/experts-warn-parents-snapchat-hook-teens-streaks/story?id=48778296

[21] *See, e.g.,* https://www.theguardian.com/technology/2017/oct/05/smartphone-addiction-silicon-valley-dystopia.

S.U.

175.    These product features serve no purpose other than creating dependencies on Defendants' products by children and teens, which dependencies in turn cause sleep deprivation, anxiety, depression, anger, shame, interpersonal conflicts, and other serious harms to mental and physical health.

176.    Defendants Meta and Snap also send push notifications and emails to encourage addictive behavior and to increase use of their social media products. Defendants Meta and Snap's communications are triggered and based upon information each of these defendants collects from and about their users, and Defendants "push" these communications to teen users in excessive numbers and disruptive times of day. These notifications are specifically designed to, and do, prompt them to open Defendants' social media products and view the content Defendants selected, increasing sessions, and resulting in greater profits to Defendants. Even the format of these notifications has been designed to pull users back on to the social media platform—irrespective of a user's health or wellbeing.

177.    Defendant Snap also allows users to enable the sharing of their location, through a tool called Snap Map, which allows the users' followers (and the public for Snaps submitted by the users) to see the user's location on a map. At all times relevant, this feature was available to all users, including minors. This is an inherently dangerous product feature, which serves no practical purpose – but that does provide strangers and predators with access to the location of minor victims. This product feature has directly contributed to stalking and other, physical harms and assaults perpetrated on minors, and these are harms known to Snap.

178.    Defendants Meta and Snap's content recommendation systems identify and promote harmful content. Defendants purposefully program these systems to prioritize number of interactions and not quality of interactions. Worded otherwise, Defendants Meta and Snap promote and amplify content based on engagement objectives and not the health and well-being of users, which renders their social media products inherently dangerous and defective, particularly when used by teens and children.

//

179.     In 2021, Senators Richard Blumenthal, Marsha Blackburn and Mike Lee tested and confirmed the fact that Meta's recommendation-based feeds and product features promote harmful content by having several accounts opened while providing information indicating that the users were teenage girls,

> "Within an hour all of our recommendations promoted pro-anorexia and eating disorder content," Blumenthal said. "Nothing has changed. It's all still happening."
>
> Sen. Mike Lee, R-Utah, said his office created an account for a 13 year old girl. Shortly afterward, the algorithm recommended a famous female celebrity to follow and when they did, Lee said, "It went dark fast."
>
> The fake account was flooded with content about diets, plastic surgery and other damaging material for an adolescent girl, he said.
>
> In another example this week, Blackburn's staff exposed a flaw in Instagram's setting for teens under 16.
>
> According to Instagram's policies, new teenage accounts should automatically default to a private setting. But when Blackburn's team set up a phony account for a 15 year old girl, it automatically defaulted to public.
>
> Mosseri acknowledged the error, explaining the mistaken default setting was triggered because the account was created on a web browser, as opposed to a mobile app.
>
> "We will correct that," he said.

180.     Defendants Meta and Snap's recommendations are not coincidence, nor are they the product of third-party speech or even Defendant Meta and Snap's speech. Defendants Meta and Snap are exerting a degree of manipulation and control over their users via their unchecked technologies that far exceeds anything the world could have contemplated even a decade ago. For example, Meta regularly "experiments" on users—users with no idea that they are being monitored and examined—to test product ideas, but also, to identify mechanisms through which Meta can control user behavior for its own profit. Moreover, Defendants are not targeting millions, thousands, or even hundreds of users with their products. Defendants'' technologies allow them to

target every single user (billions of people) simultaneously and on an individual basis, which fact makes their algorithmic and social media products far more dangerous than anything American courts or lawmakers have ever seen or could even have conceived of until Meta's internal documents were released in late 2021.

181.    Defendants Meta and Snap are aware of the harms their content recommendation technologies cause and chose to not disclose those harms or fix their technologies – for example, by programming their systems for safety or user benefit over profit or by simply not using those systems, which serve no practical function, in the case of minor users. For these reasons, the harms were unknown to all users and could not reasonably be avoided.

182.    More to the point, Defendants Meta and Snap's content recommendation technologies serve no countervailing benefit to consumers. Users are perfectly capable of running their own searches, as they do with any number of available search engines. And if the harmful third-party content were being provided in that manner – *i.e.* if this was content requested and sought out by users as opposed to content identified and force fed to users as means to make Defendants more money – it would not be at issue in this case.

183.    Defendant Meta's group recommendation systems also direct users, including children and teens, to harmful and in some cases deadly groups. Meta is aware of these harms but has also determined that the more users it can connect to one another (including adult and child connections) the more likely it is to retain those users for the long term. This includes predators. That is, Meta has implicitly (if not explicitly) determined that helping predators find children is good for its bottom line.

184.    These are just known examples, and Plaintiff belief that they will identify other examples of harmful product features through discovery in this case.

185.    What is known is that Defendants Meta, Snap, Roblox, and Discord have deliberately designed their products this way to increase engagement; employ invasive, surreptitious means to operate these technologies; fail to warn users or their parents of these dangers known only to Defendants; and refuse to restrict their use of these products in connection with minors' accounts or otherwise make these products safe, despite knowledge of the harms

perpetrated on American youth in general and on Plaintiff in particular.

186.    The cost of designing safer products and fixing known defects is negligible. In fact, each of the above examples could be addressed in a matter of hours, not days. These products serve no purpose for consumers, and the benefit of making the necessary changes would be high in terms of reducing the quantum of mental and physical injury sustained by minor users and their families.

187.    But also, each of these Defendants has developed artificial intelligence technology that detects adult users of who send sexually explicit content to children and receive sexually explicit images from children. These technologies furnish Meta, Snap, Roblox, and Discord with actual knowledge that a significant number of minor users of their products are solicited to send, and do send, sexually explicit photos and videos of themselves to adult users in violation of 18 U.S.C. § 1591(a)(1)-(2). Defendants *could* protect their minor users, but in many instances, do not.

188.    On information and belief, Meta, Snap, Roblox, and Discord target and market to teens and children, including children under the age of 13, and are aware that they are providing their dangerous social media products to children under 13, but deliberately designed their products in a manner intended and that does make it easier for these underage users to open accounts and use their products. In some cases, they have even made it easier for underage users to open multiple accounts on the same app.

**F.    Plaintiffs Expressly Disclaim Any and All Claims Seeking to Hold Defendants Liable as the Publisher or Speaker of Any Content Provided, Posted, or Created by Third Parties**

189.    Plaintiffs seek to hold Defendants accountable for their own alleged acts and omissions. Plaintiffs' claims arise from Defendants' status as designers and marketers of dangerously defective social media product, as well as Defendants' own statements and actions, not as the speaker or publisher of third-party content.

190.    Defendants Meta and Snap designed and have progressively modified their products to promote problematic and excessive use that they know is indicative of addictive and self-destructive use. Defendants' product features are designed to be and are addictive and harmful

in themselves, without regard to any content that may exist on Defendants' platforms.

191.    The structure of Defendants' products and the products Defendants' design and utilize – for example, direct messaging and public profile products – are, standing alone, harmful to users and irrespective of content.

192.    Defendant Meta and Snap's recommendation technologies also, and standing alone, are harmful to users and irrespective of content. For example, a primary purpose of Defendant Meta and Snap's algorithm designs is to determine individual user preferences first so that Defendants Meta and Snap can then influence user behavior and choices second—which is particularly dangerous in the case of teens. On a content neutral basis, the manipulation and control these Defendants knowingly wield over their users daily is profoundly dangerous.

193.    All of these Defendants have designed other product features for the purpose of encouraging and assisting children in evasion of parental oversight, protection, and consent, which features are wholly unnecessary to the operation of Defendants' products.

194.    Defendants Meta and Snap affirmatively promote, encourage, and/or otherwise contribute to the development of harmful content. In an October 2021 Senate Hearing it was revealed that Meta documents provided by a whistleblower demonstrate that Defendants promote, encourage, and/or otherwise contribute to the development of harmful content. The Senate hearing revealed that,

      a.  Defendants approve of ads that contain harmful content, for example, "designed to encourage and promote anorexia" and encourage children to abuse prescription or illegal drugs, which ads Defendants then target specifically at children in exchange for payment.

      b.  Defendants utilize private information of their minor users to "precisely target [them] with content and recommendations, assessing what will provoke a reaction," including encouragement of "destructive and dangerous behaviors." Defendants specifically select and push this harmful content, for which they are paid, to increase user engagement. "That's how [defendants] can push teens into darker and darker places." (Senator Blumenthal, October 5, 2022).

c. Defendants "know[] that [their] amplification algorithms, things like engagement-based ranking … can lead children from very innocuous topics like healthy recipes … all the way from just something innocent like healthy recipes to anorexia promoting content over a very short period of time." Defendants have knowledge that their products and the content they are encouraging and helping to create is harmful to young users and choose "profits over safety."

195.   Defendants are responsible for the harms described herein. These harms were caused by Defendants' designs and design-decisions, and failures to warn, and not any single incident of third-party content.

196.   While it may be that a third party creates a particular piece of harmful content or engage in bad acts when utilizing internet services, the teens and children harmed by Defendants' products in the manner described herein are not being harmed by a single piece of harmful content or a single bad actor. They are being harmed by Defendants' products, programming, and decisions to expose teens and children to harmful product features, and to then conceal the harms their products are causing in the interest of their own engagement and growth goals.

197.   The harms at issue in this case do not relate to or arise from third party content, but rather, Defendants' product features and designs, including algorithms and other technology that (a) addicts minor users to their products; (b) amplify and promote harmful social comparison through product features; (c) affirmatively select and promote harmful content to vulnerable users based on its individualized demographic data and social media activity; and (d) put minor users in contact with dangerous adult predators and otherwise expose to them to seemingly unstoppable unwanted interactions from persons not on their friend list or equivalent. Indeed, the foregoing are merely examples of the kinds of harms at issue in this case.

198.   None of Plaintiff's claims rely on treating Defendants as the publisher or speaker of any third party's words or content. Plaintiff's claims seek to hold these Defendants accountable for their own allegedly wrongful acts and omissions, not for the speech of others or for any good faith attempts on the part of these Defendants to restrict access objectionable content.

//

199.     None of Plaintiffs' Claims for Relief set forth herein treat Defendants as a speaker or publisher of content posted by third parties. Rather, Plaintiffs seek to hold Defendants liable for their own speech and their own silence in failing to warn of foreseeable dangers arising from anticipate use of their products. Defendants could manifestly fulfill their legal duty to design a reasonably safe social product and furnish adequate warnings of foreseeable dangers arising out of the use of their products without altering, deleting, or modifying the content of a single third-party post or communication. Some examples include,

a.   In the case of Defendant Roblox, not enabling its direct messaging feature in the case of minors, or now allowing adult users to engage in direct messages with minors without parental consent; not allowing users to transfer in-game currency to other users or not allowing users to transfer in-game currency to minors without parental knowledge and consent; and notifying minor users' parents of all currency transfers and private messaging activity.

b.   In the case of Defendant Discord, not enabling its direct messaging feature in the case of minors; not telling minors that it will keep them "safe" on its platform, including by providing an option whereby Discord will monitor and/or record all messaging involving the minor user; and actually protecting and/or notifying minor users' parents of all private messaging activity.

c.   In the case of Defendants Meta and Snap, not using their addictive and inherently dangerous algorithm and similar technologies in connection with any account held by a user under the age of 18; not permitting any targeted advertisements to any user under the age of 18; prioritizing internally their removal of harmful content (content their systems are promoting and amplifying) over the risk of losing some user engagement; removing social comparison features and/or hiding those features to reduce their harmful impact on teen users; instituting advertising safeguards to ensure that Defendants are not profiting directly from or otherwise pushing or endorsing harmful advertising content and removing advertising targeting tools so that advertisers

cannot harm vulnerable user groups by aiming harmful advertisements at them;
requiring that all teen user accounts be set to private and not allowing any user
under the age of 18 to change user settings to public; removing all friend and
group and content recommendation systems that involve teen users in any way
(so, not recommending to teen users, but also, not recommending teen users to
adults) and not permitting direct messaging or other forms of direct
communication with any user under the age of 18 not already on the other user's
friend list; programming the speed of their recommendation technologies to
slow at certain times of day, for example, two hours before 10:00 p.m. to help
minors disengage from Defendants' addictive designs; disabling minor
accounts from 11:00 p.m. until 6:00 a.m. to address the problematic use caused
by Defendants' addictive designs.

d.  In the case of Defendants Discord, Meta, and Snap, immediate suspension of
accounts where Defendants have reason to know that the user is under the age
of 13, including when the user declares that they are under the age of 13 in their
bio or comments or chats and/or messages with any third party and where
Defendants can determine an "estimated" age of under 13 based on other
information they collect and/or have in their possession (including, for example,
posted videos that clearly feature children under 13); and not allowing the
account to resume until the user provides proof of age and identity and/or
parental consent.

e.  In the case of all Defendants, suspension of accounts and, in some cases, user
bans, where Defendants have reason to know that the user is over the age of 18,
but where they are providing information to suggest that they are minors and/or
are representing themselves as minors to other users; and not allowing the
account to resume until the user provides proof of age and identity.

f.  In the case of all Defendants, requiring identification upon opening of a new
account, requiring parental consent for users under the age of 18, and restricting

users under the age of 18 to a single account.

g. In the case of all Defendants, requiring verification of email and phone number when a user opens a new account. Not requiring verification allows underage users to access these social media products and does not stop bad actors.

200. These are just some examples, all of which could be accomplished easily and/or at commercially reasonable cost. Defendants know that they can make these change and, in many cases, have discussed these or similar changes internally. However, they have not instituted these types of safety features because they know that doing so would impact their astronomical revenue.

## V.      PLAINTIFF-SPECIFIC ALLEGATIONS

201. S.U. was born in March 2009, and grew up in Long Beach, California.

202. From the moment she was born, S.U. was a strong, engaged, and intelligent child. The nurses said she had strong hands, and she only got stronger from there.

203. S.U. was happy and a natural leader and friend to her peers. She was on honor roll until fourth grade, which is when her social media use began, and had no history of anxiety, depression, behavioral issues, illness, or trauma of any sort.  She was a typical smart, happy, and kind child, who loved spending time with friends and family, and dreaming of her bright future.

204. When S.U. was 9 or 10, she began playing the popular kids' game, Roblox. She would play Roblox on a computer, where C.U. could see her most of the time.  C.U. understood Roblox was made for and marketed to kids and, from what she could tell, it was a relatively harmless game. It was like the popular kids' game, Minecraft.

205. Roblox provided no parental warnings about its features that would allow adult users to message S.U. directly, as opposed to chatting in a group setting. Plaintiff thought S.U. would be playing with other children, and that Roblox was a children's game with moderators and other safeguards in place to protect the kids who played. C.U. would never have allowed S.U. to play Roblox had she known the truth and, likewise, C.U.'s parents would never have provided S.U. with funds for Roblox currency as rewards had they known the truth.

206. When S.U. began playing Roblox she was most interested in building games and games where she could customize her characters.

207.    Then when S.U. was 10, she got an iPad for Christmas.

208.    She was thrilled to be able to Roblox on her iPad and appeared to be okay with the house rules regarding devices – which included limits to the number of hours she could use the iPad and plugging it in outside her room at night. At first, S.U. appeared to be following the rules, however, in early 2020 things began to change.

209.    Unbeknownst to C.U., S.U. was "befriended" on the Roblox game by Charles, an 18-year-old male. This occurred sometime in early 2020, just as the pandemic was starting.

210.    Charles told S.U. that they were becoming friends and he wanted to be able to chat with her more, and didn't she want that too? At first, S.U. said she was not allowed on social media, but Charles persisted. S.U. did not know if she would be able to get the Discord product on her tablet, because it was against her mom's rules, but she agreed to try.

211.    S.U. downloaded Discord and opened an account. She was nervous, but then was given the option to click on direct messaging settings, including one titled the "Keep me safe" setting. This setting gave Discord permission to record and listen in on all the conversations and chats that took place on the Discord product. Specifically, and as S.U. reasonably understood the notice, Discord was providing her an option that would allow Discord to (and Discord would) listen in on her conversations and record them and to help keep her "safe." S.U. chose that option because she believed she would be safe, to the point where she did not need to tell her parents. She was 10 and understood Discord's statements as meaning that an adult would know what she was saying and doing on Discord.

212.    S.U. has requested her data from Discord multiple times over the last two years for copies of her activity.  The automated message from Discord each time was that she could expect to receive her data in 30 days.  Discord also has her email address.  Yet she has still never received the requested data or any other response from Discord with regard to her requests.

213.    S.U. provided her Discord user information to Charlies, who invited her to join a Discord server for the two of them.  Charles exploited and abused S.U. for months. He encouraged her to drink and take prescription drugs, and manipulated her, and then introduced her to several of his friends, who also manipulated, exploited, and abused S.U. – who was 10 and 11 at the time.

The Discord product enabled and encouraged these illegal acts, including by allowing fake usernames, by not verifying age, identity, and parental consent, and by representing to minor uses that Discord would keep them safe when messaging strangers on its product – which it did not do.

214.    At some point, C.U. discovered that S.U. was using Discord and asked her about the Discord product. S.U. claimed that her friends used Discord to stay in contact, because schooling had moved online due to COVID. S.U. also explained to her mother that Discord monitored, recorded, and kept all discussions, and C.U. said she could use Discord for the purpose of staying in contact with her friends. But still, she could only use the iPad for limited amounts of time and could not have the iPad in her room at night. S.U. said that she agreed.

215.    Shortly thereafter, S.U. was encouraged to open other social media accounts by the adult men who found her through the Roblox and now Discord products. Having learned that certain social media companies would provide minors with access without parental knowledge or consent, S.U. proceeded to open Instagram and Snapchat accounts. These accounts were opened without parental knowledge or consent, though S.U. would later use Defendants' advertising and product-related representations to convince her mother that such products were safe and age-appropriate.

216.    For example, and tired of having to hide her Snapchat usage, S.U. eventually asked her mother, C.U. if she could have a Snapchat account. The pandemic has started and S.U. said that her friends used Snapchat to keep in contact, since they could no longer see each other. S.U. also explained that it was a fun photo sharing app, with goofy filters and harmless, disappearing messages. In fact, school clubs and sports often used Snapchat to schedule events and keep in touch. C.U. had no reason to doubt those statements, all of which were indeed ways in which Snapchat described its own social media product.

217.    What C.U. did not know at the time, was that S.U. had already opened and was using both Snapchat and Instagram accounts.

218.    S.U. opened these accounts without C.U.'s knowledge and consent, and began using the Snapchat and Instagram products more and more, without C.U.'s knowledge or consent. Unbeknownst to either of the Plaintiffs' the Snapchat and Instagram products are designed to be

addictive, particularly to minors, and result in severe dependencies among a significant number of Defendant Snapchat and Instagram's minor users. Snap and Meta are aware of these harmful aspects of their products and continue to purposefully design and develop products that will lock-in their minor users even further – and irrespective of the known harms they are causing.

219.    S.U.'s use of and developing addiction to Instagram and Snapchat, as well as the exploitation facilitated and enabled by the Roblox and Discord products, coincided with a steady and severe decline in S.U.'s mental health.

220.    Despite house rules, S.U. began staying up late to use these social media products at night, especially Instagram and Snapchat. C.U. does not know the full extent to which S.U. used them at night but knows that over time S.U. began getting more and more tired and started to withdraw from the things she loved, and her family.

221.    Because of Instagram and Snapchat, S.U. developed a harmful and problematic dependance on her cell phone and other electronic devices. When C.U. tried to exercise her parental authority by limiting or restricting access to social media, S.U. had increasingly severe reactions – which reactions are foreseeable in the case of addiction, but where the fact of addiction was known only to Defendants Meta and Snap and not to any of their users. On the contrary, Defendant Meta gave sworn testimony to Congress several times denying that its products were addictive when, in fact, Meta had already conducted studies concluding and otherwise had actual and explicit knowledge of the exact opposite. Meta internally re-frames these identified addictions as "problematic use" and, prior to when S.U. began using the Instagram product, Meta had actual knowledge that use of its product resulted in problematic use in a significant percentage of its users, that Meta's product designs were largely responsible for these harms, and that Meta could make numerous (quick and inexpensive) product changes to reduce these harms.

222.    Meta also knew that the incidence of "problematic use" of its products among minors was greater than with adult users, and that a large part of the reason for this is that the Frontal Cortex in a minor is not yet fully developed. Indeed, the Frontal Cortex of minors is frequently discussed in Meta internal documents, including ways in which Meta can re-design and/or aim its product features at minors to best take advantage of this unique "vulnerability."

223.    In many instances, Meta employees made recommendations to Meta leadership – as early as 2017 and likely even earlier – as to how Meta could make its products less addictive, and voiced concerns over the harms addiction to its products were causing users. Meta leaderships routinely rejected and or ignored these recommendations and concerns, explaining that engagement and growth were Meta's first priorities. In the well-words of Meta's found and CEO, Mark Zuckerberg, Meta's goal was to "Move fast and break things."

224.    Meta knew, for several years, that it was harming children in the precise manner it then began to harm S.U., and Meta leadership did not care.

225.    As S.U.'s dependency on the Instagram and Snapchat products grew, she became resentful of household rules meant to keep her safe. Fights and tensions broke out over device rules that had never been a problem, and only worsened as S.U. began feeling like she could not go even a matter of minutes without access to social media. Over time, S.U. began experiencing the types of anxiety and discomfort when not able to use Defendants' products that are the hallmarks of several addiction and withdrawal symptoms.

226.    Meta knew, even anticipated, these types of harms to minor users, but did nothing to warn minors or their parents and did nothing to make simple and quick product changes Meta knew would result in the dramatic lessening of these harms.

227.    In December of 2020, when S.U. was 11, her father had purchased her a cell phone. From there it became even harder for C.U. to monitor S.U.'s device usage and/or keep her offline. By the time S.U. finally discovered that Defendants Meta and Snap were providing her underage child with access to their social media products, there was literally nothing she could do not stop them from providing that access.

228.    Defendants Meta, Snap, and Discord know that children like S.U. are using their products without their parents' knowledge or consent. In fact, they are counting on it, as these children make up a substantial percentage of their user base.

229.    Children and teens engage with these products at exponentially higher rates than adults, that is, they are often easier to lock-in to these products and lack self-control and exhibit other characteristics due to an undeveloped Frontal Cortex. This is also why minor users tend to

1    spend exponentially more time on Defendants' products than the average adult user, which makes

2    them more valuable in the case of Defendants – like Meta and Snap – that generate revenue based

3    on how long they can keep a user locked-in and using their product.

4         230.    Roblox and Snap market to and target minors to use their products, while Meta and

5    Snap consider children and teens their most profitable asset. In fact, Meta internally refers to teen

6    activity on its social media products as "jobs" teens can do for Meta. That is, Meta (and, on

7    information and belief, Snap) are constantly looking for ways to increase teen and child

8    engagement on their platform, to convince and exploit children into posting and exchanging more

9    content, interacting with more strangers, and the like – all because they know that the more time

10   these kids are locked-into their products, the more money they make.

11        231.    Meta and Snap have no regard for parental authority or consent, and only purport

12   to address those concerns when asked by Congress and/or when they believe that their userbase

13   will be threatened if they do not – even then, Meta and Snap conceal the truth and otherwise

14   misdirect in an attempt to continue in their current activities uninterrupted, and despite knowledge

15   that they are causing serious harms to millions of American teens and children.

16        232.    To name only one example, Meta internal documents discuss and consider a wide

17   range of topics relating to unauthorized use of their products and encouragement of the same. This

18   includes but is not limited to studying and encouraging the opening of multiple, secret accounts

19   by teens, which Meta calls a "unique value prop[osition]." It also includes studying how teens can

20   be used to recruit younger siblings and, in the case of teens trying to teach younger siblings caution

21   in use of social media, how Meta can get around those teens and market directly to the younger

22   siblings. In Meta's view, there are many "jobs" these kids could be doing to make Meta even richer

23   than it is now, and Meta needs to find ways to provide kids with access even when their parents

24   and older siblings will not.

25        233.    At all times relevant, S.U. knew that she had to say that she was 13 to open

26   Instagram, Snapchat, and Discord accounts, but that it was not an issue and that she could tell

27   people her real age via Defendants' social media products. It is relatively common for kids to open

28   accounts before 13 and put their actual age in their bio and elsewhere, with the general

understanding that Defendants do not care and will not do anything about it. S.U. also began opening additional, secret Instagram accounts, known as FINSTAS (short for Fake Instagram), which Instagram actively encourages despite knowledge that teens and children use these accounts to hide their use of Instagram from their parents.

234.    Meta and Snap program their technologies to addict and *then* escalate with child and teen users, which is precisely what they began doing to S.U.

235.    Meta and Snap started identifying and sending harmful content before the pandemic, however, after the pandemic began in early 2020, they started identifying and sending that content to S.U. in significantly higher volumes. This was not content S.U. asked for or even wanted to see. Defendants' decisions in this regard compounded the harms already being caused by their addictively designed social media products to S.U., who was still not yet even 13.

236.    Unbeknownst to Plaintiff C.U., S.U. began acting out and engaging in self-harming behavior in early 2020, as the result of the exploitation facilitated by Roblox and Discord, but also, because of her growing social media addiction, sleep deprivation, and social comparison harms caused by the Instagram and Snapchat products.

237.    S.U. began taking alcohol from her father's liquor cabinet, and sneaking Benadryl and other over the counter drugs, like what she was seeing others do and encourage in the content Meta's programming and recommendation technologies were identifying and sending to her to increase her engagement with its Instagram product.

238.    In or around July 2020, Charles and S.U. stopped talking and Roblox facilitated another harmful relationship – this time, with an adult Roblox user who told S.U. that he was a moderator for the Roblox game she was playing.  This Roblox user's name was Matthew, he was 22 years old, and lived in Missouri.

239.    Matthew used his position of apparent power within the Roblox game S.U. was playing to entice and exploit her. For example, he told S.U. that he could get her certain in-game privileges. He said that he could make it so that she could chaperone with him or become a moderator for the game as well. He also manipulated S.U. into giving him her Robux and promised to do the same, but never did. The way he accomplished this was to make an item and then convince

her to purchase the item with more Robux than it was worth. On information and belief, this is a common way that adult users obtain funds from children and provide funds to children via Roblox, which allows them to exchange such currency without parental knowledge or consent.

240.    Like Charles, Matthew eventually convinced S.U. to move their growing "friendship" over to Discord and, this time, to Snapchat, where he groomed S.U. for months.

241.    Matthew convinced S.U. to send exploitative photos and videos on Snapchat. More to the point, Snap convinced S.U. that it would be safe to send her photos via Snapchat.

242.    Like most minors, S.U. believed Snap's advertising and promises that once a Snap was sent and viewed it would disappear forever. Because of Snapchat's "disappearing" message feature and other design features geared toward the promotion of sharing explicit images, S.U. agreed to and did send sexually explicit images using Snapchat, which only further increased her embarrassment, shame, and the adult Snapchat user's ability to continue exploiting her.

243.    On information and belief, Matthew – like many adult predators – use Snapchat because they know it is easier to exploit minors through Snapchat's product features and, at the same time, exponentially harder to get caught. In fact, Snap has a "My Eyes Only" product, which many parents do not know about.

244.    In fact, Snap's My Eyes Only Product was particularly harmful to S.U. and S.U.'s exploitation and abuse would have stopped much sooner but for the My Eyes Only product.

245.    My Eyes Only encourages and enables young users and predators to hide harmful content by allowing them to hide content in a special tab within Snapchat itself that requires a passcode, and where content cannot be recovered – even by Snap– without the correct passcode. If a user attempts to access the hidden folder with the wrong code, eventually, they get permanently locked out of access. My Eyes Only has no practical purpose or use, other than to hide potentially harmful content from parents and/or legal owners of the devices used to access Snap. In other words, it is useful only to minors and bad actors. Snap is quite literally the only product known to Plaintiffs that provides a data self-destruct service and, on information and belief, these types of unique product features are one of several reasons predators choose Snapchat in the first place.

//

246.    S.U. relied heavily on Snap's My Eyes Only product and chose to use Snap more because of this feature. She knew that her parents would be able to find her Snapchat content if they looked at her Snapchat app, but that they did not know about My Eyes Only and could not find the content she saved in there – this is the location where S.U. saved all of her explicit photos, including photos of herself and the adult, males who were exploiting and abusing her.  But for the My Eyes Only feature, there were times when S.U.'s mother would have found harmful content and other evidence as to what was happening, for example, through the Snapchat memories feature. Moreover, S.U.'s parents would have found the harmful content had S.U. instead saved it to her device, or even cloud storage through her phone. S.U.'s parents would have discovered the abuse and exploitation S.U. was suffering sooner but for Snap's My Eyes Only feature.

247.    On information and belief, Snap also benefits directly from the engagement of predators like Matthew on its social media product.

248.    On information and belief, many of these explicit (and illegal) photos and videos are circulated and/or sold for payment – and S.U.'s explicit photos and videos were likewise circulated and/or sold for payment – and Defendant Snap (like Meta) makes revenue through ad content that, in turn, relies on how long Snap can keep a user engaged and signed into its product.

249.    S.U. was not only struggling with the exploitation and abuse occurring on Discord and Snap, but she was struggling significantly with her addiction to Defendants' products and what that addiction had done to her relationship with her parents.  S.U., who had always loved and trusted her parents, had become resentful of their house rules, and attempts to restrict her social media access. She snuck around to obtain access and use of social media, and then began feeling guilty and shameful of lying to her parents.  In short, all the addiction-related harms that happen to adults suffering from addiction were happening to a child suffering from addiction, but where only the social media companies themselves – Meta and Snap – had any reason to know or understand that S.U. was addicted to their products.

250.    In fact, Defendants Meta and Snap both had actual knowledge of the growing addiction, including from age and usage information provided to them by S.U. and/or collected by them from S.U. and the devices she used. Meta and Snap both monitor usage and have knowledge

when minor users are using their products in the middle of the night and excessively and in a manner that is known by Defendants to be harmful.

251.    Moreover, Charles and Matthew are two adult Roblox users who abused and exploited S.U. but, they are not the only two who obtained access to minor S.U. because of the Roblox product. From the outset, S.U. was approached by adult males who claimed to want to be her "friend." They were allowed to message her privately through the Roblox private message features, but also messaged her in group chats once they learned that she was a minor female. S.U. always wondered how Roblox knew when someone was swearing, or fighting, or engaged in other "prohibited" behavior on the Roblox game but ignored entirely the rampant and overt sexual advances she received from adult players on a regular basis.

252.    Roblox is designed and marketed for children, like S.U., but allows adults to use its product as well and provided those adults with unfettered access to children. Roblox knows the age of its users and, during the time frame at issue, failed to take reasonable steps to warn parents and children of these dangers.

253.    At all times Roblox could have taken reasonable steps to better product their users, including, for example, not distributing its direct messaging product to minor users and/or allowing adults to use that product to obtain access to minor users. Roblox could have made these changes at nominal time and expense, moreover, the harmful and/or defective products are unnecessary to operation of the Roblox game.

254.    Instead, Roblox failed to warn, and marketed its product as safe and fun for kids.

255.    Moreover, adult males solicited and exploited or attempted to exploit S.U. via the Instagram and Snap public profile, user recommendation (Quick Add in the case of Snap and PYMK in the case of Meta), and private messaging features of those products. These are adults that never would have been able to find and/or have connected with S.U. but for these Meta and Snap product features. But because of those features, they were able to message and harass minor S.U., further contributing to her harms.

256.    S.U. attempted suicide in late July 2020, and again in August 2020.

//

257.    She was sleeping only a few hours each night, while spending several hours using the Instagram and Snap social media products without her parents' knowledge and/or consent. She was also struggling under the weight and mental harms caused by the exploitation and abuse occurring because of the Roblox and Discord products, which her parents also did not know about and could not reasonably discover because of the way Defendants design and operate their products. These Defendants all know that they are harming children and teens, that they could reduce and/or eliminate these harms via unilateral product changes (*i.e.* without having to monitor or censor any user-created content), and that they could do so quickly and cost effectively. However, they also know that would lose revenue if their products were safer, including because this would decrease engagement of teens (teens who are not allowed to be using their product in the first place) and at least some adult users (users who are using their products to exploit and abuse children). One of the most shocking examples of this type of knowledge is an internal Meta document in which a Meta employee who was tasked with studying the harms caused by Meta's People You May Know product – a user recommendation technology that suggests to users other users they may want to "friend" – states that one of the three most interesting harms to come from his research is that the PYMK product has, in the past, contributed up to 75% of adult/minor grooming that occurs on Meta's social media products. Another Meta employee asks why Meta has not simply turned off this product feature, at least as to minor accounts. The answer, of course, is that Defendants (or at least Defendant Meta) prioritize engagement and growth over user safety, ***even*** when they have actual knowledge that their product features are contributing to the sexual abuse of children. This cannot be allowed to stand.

258.    Defendants Instagram and Snap also sent S.U. notifications, created and designed to increase user addiction and to persuade S.U. to log back on to each of their respective social media products.  S.U. received and responded to such notifications, which increased her level of dependency on the Instagram and Snap products through targeted delivery of harmful content.

259.    Defendants Instagram and Snap knew that these notifications were unnecessary to the operation of their products and were harmful or potentially harmful to a significant number of their minor users but continued sending them anyway.

260.     S.U. became locked-in and addicted to these products as Defendants intended. She would spend hours every day (and night) on social media, to the point where she felt as though she could not live without these products. In fact, if asked whether S.U. would give up Instagram and Snap or her right arm, she believes that she would choose her arm for the simple reason that she can live with only one arm – S.U. does not feel that she can live without Instagram and Snapchat.

261.     That is how dangerous these products are to American youth, and Meta and Snap know and/or have actual knowledge that they are designing and distributing products that are highly addictive to a significant percentage of their teen and child users. Rather than disclosing or warning of these dangers, Meta and Snap have publicly denied and concealed them.

262.     On information and belief, each of these Defendants had the technology necessary to enforce their Community Guidelines and to ensure that their products were the safe and fun products they advertised themselves as being – but did not, because they knew that enforcing their safety related rules would result in lower user engagement and, thus, lower revenue.

263.     In August 2020, availability finally opened and C.U. was able to get S.U. into counseling. She attended counseling regularly for several months, but things were not improving.

264.     This is one of the greatest harms Defendants have caused to the American public and medical and insurance systems. Millions of families and doctors have been trying to help children and teens through unknown traumas and injuries and have been unable to provide the treatment and help needed because of these Defendants. Defendants' refusal and failure to disclose what they knew and when they knew regarding "problematic use" of their products, social media addiction, and resulting harms and traumas has kept families and practitioners in the dark and without critical information; information they needed to help these children and teens.

265.     Defendants have known that their products were causing these harms for some time, including and before they caused these harms to S.U. and her family, but made the deliberate cost-benefit decision to stay the course in the interest of their own profits and growth.

266.     On March 3, 2021 (just before her 12th birthday), S.U. decided that she would no longer be attending online school and slammed down her school computer. She became upset and inconsolable, so her mother took her to the Emergency Room. S.U. was admitted and kept in the

hospital for five days, due to discovery that she had made a suicide plan for her birthday.

267.    S.U. was only 11 and she was contemplating suicide because of the harms caused by Defendants' products. In fact, on December 7, 2021, the United States Surgeon General issued an advisory cataloging a dramatic increase in teen mental health crises.  He reported that, between 2007 and 2018 (to name only one example) suicide rates among youth ages twelve to sixteen in the U.S. increased a staggering 146 percent.  Moreover, the most significant and far-reaching change to the lives of young people during this period was the widespread adoption of mobile social media platforms, like those designed and distributed by these Defendants.

268.    Defendants can deny responsibility all they want, but that does not change the fact that they are causing these deaths and mental health harms, that they know which aspects of their products are causing these deaths and mental health harms, that they could fix their products at nominal time and expense and/or provide adequate warnings to users and parents, and that they have instead chosen their own profits and growth. Defendants are operating without regulation and oversight and have thoroughly and undeniably abused those freedoms to the detriment of millions of American children and teens, and their families – families like this one.

269.    When the hospital released S.U., C.U. wanted her to get involved in an intensive outpatient program, but none were available and/or affordable. S.U. was released with a safety plan. However, C.U. could not monitor S.U. while S.U. was with her father and, a few days later, she had to be taken back to the hospital, after she ingested Ambien, Benadryl, and alcohol.

270.    The hospital monitored S.U. for 33 hours, and CPS visited C.U.'s home to find out how S.U. obtained access to prescription medications while on a safety plan.

271.    The next step was a partial hospitalization program (PHP).

272.    S.U. was taken out of school entirely to attend the PHP, but things only got worse and, in June of 2021, S.U. began engaging in self-harm while attending the PHP.

273.    In June of 2021, S.U. was put into a residential treatment program. This was difficult and concerning for S.U.'s parents, as she was only 12 and they had serious concerns about the safety of a live-in program. The program reassured them, stating that it was safe and that the kids were constantly monitored.

274.   On July 4, 2021, S.U. was sexually assaulted by another resident while in the residential treatment program. C.U. pulled her out immediately and began looking for other options. In fact, C.U. spent the better part of July through October looking or other options. It took that long for C.U. to find a new therapist, who S.U. began seeing. However, S.U. continued to struggle under the unspoken weight of her social media addiction, anxiety, depression, history of exploitation, and other harms caused by Defendants' products as set forth in more detail above.

275.   These are all harms Defendants knew or should have known as being caused by from use of their addictive, defective, and/or inherently dangerous products to a significant number of their minor users.

276.   S.U. was hospitalized multiple times in January and February 2022. She also received several different diagnoses as she made her way through treatment – all the time, with no one knowing or having reason to know of her dependency on and/or harms arising from Defendants' products. Diagnoses given to S.U. ranged from: adjustment disorder, to clinical depression, to cannabis use disorder, to anxiety disorder, to PTSD, to recurrent episode disorder, to borderline personality disorder, to anything the doctors could think of to explain what S.U. and her family were going through and why.

277.   More than one of S.U.'s breakdowns occurred as direct result of C.U. trying to limit and/or restrict S.U.'s access to social media or obtain information relating to the device C.U. used for social media. When it came to social media, C.U. was a different person – as is typical and foreseeable in the case of addiction, but where Defendants Meta and Snap were the only ones who knew, should of known, and had reason to know that such addiction existed and was the result of S.U.'s use of the products they had designed, manufactured, and were not distributing to S.U. – who was still not yet 13 years old.

278.   Prior to the above-described social media use, S.U. had no history of anxiety, depression, behavioral issues, illness, or trauma of any sort.  She was a typical smart, happy, and kind child, who loved spending time with friends and family, and dreamt of a bright future.

279.   But for Roblox's marketing to children, representations of safety, and failure to warn of harms known to Roblox and arising from its Direct Message products and capabilities –

which products were never necessary to the operation of the Roblox game – S.U. would not have been exposed to Defendant Roblox's inherently dangerous and defective features and design and would not have been exploited and abused via the Roblox product.

280.    But for Discord's defective and/or inherently misleading safety features and, independently, its failure to conduct reasonable verification of age, identity, and parental consent, S.U. would not have been exposed to Defendant Discord's inherently dangerous and defective features and design and would not have been exploited and abused via the Discord product

281.    But for Defendants Meta and Snap's failure to conduct reasonable verification of age, identity, and parental consent, S.U. would not have been exposed Defendants Meta and Snap's inherently dangerous and defective features and design.

282.    Because of each of Meta and Snap's failure to warn, misrepresentations as to the safety and design of their products, and engineered addiction their products are meant to cause, S.U. became addicted to the Instagram and Snapchat products without her parents' knowledge or consent. S.U. suffered foreseeable and independent harms because of this addiction, and the sleep deprivation, anxiety, depression, and related harms it caused.

283.    But for certain Instagram product features (to name only a few examples, Instagram's "like" feature and the volume and degree to which it identifies and directs known, harmful social comparison content to its Explore feature – particularly in the case of young, female users), S.U. would not have experienced the anxiety and depression that stem from harmful social comparison designs. These too are harms Meta knew about prior to S.U.'s use, have identified and discussed in its own internal documents, and where Meta knows that there are quick and cost-effective product changes it could make and that would have an exponential impact in terms of decreasing the harms Meta currently is causing to teens and children because of its current social media product and design. Meta leadership simply does not care, and as evidenced by Meta's own records, continues to prioritize engagement and growth over the safety of its young users.

284.    None of these Defendants were providing fun and safe gaming, communication, and photo sharing services, but rather, they were dealing in incredibly addictive product features, pushing harmful algorithmically driven content, and were promising, providing, and even

encouraging adult users with unrestricted access to young children like S.U. to engage in harmful conduct for Defendants' own financial and growth gains.

285.    Moreover, Defendants Meta and Snap made harmful recommendations to and about S.U., connecting her with strangers to increase their own engagement and thereby their own profits, which recommendations had nothing to do with any communication or informational aspects of Defendants' products.

286.    Defendants Meta, Snap, Roblox, and Discord provided other users via their products and product design with unsupervised and unfettered access to S.U. through public profiles and features, recommendation systems, and/or features that provided direct messaging access to S.U. regardless of her minor status, regardless of whether other users were on her "friends" list or equivalent, and regardless of duration, time of day, or frequency. These defects are prevalent in these defendants' products, and Defendants are aware of these defects.

287.    Defendant Meta also utilized algorithms and/or similar technologies to steer S.U. towards and otherwise promote and amplify harmful and unsolicited content. Meta is not only aware of its promotion and amplification of harmful content but knew or should have known that the harms caused by its marketing and amplification systems would be exacerbated by S.U.'s sleep deprivation, which information Meta also had actual knowledge of as it tracks all user and usage information and studies and utilizes that information in a variety of ways. On information and belief, because of the data points Meta collects and how it collects and utilizes that data, Meta knows or should know when teens and children are using their products, knows when they are using them at night, and knows when such use becomes problematic. Plaintiff alleges actual knowledge by Meta, coupled with Meta's purposeful failure to act and/or fix it products, to alert its minor users' parents, or to otherwise take reasonable and necessary actions to minimize, reduce, and/or prevent the harms it knows its product is causing to millions of U.S. teens and children – which harms it knew or should have known its product was causing S.U. and her family.

288.    Instead, Defendant Meta's algorithms and similar technologies are designed to exploit these Meta-caused vulnerabilities. For example, the more addicted and sleep deprived a user becomes, the more Meta's systems promote and amplify harmful content and the more push

notifications Meta sends. To be clear, these harms are caused, and actions taken *because* of Meta's programming and product decisions. Decisions Meta now makes with actual knowledge of the harms it is causing, particularly to young users, and makes anyway and with the stated purpose of increasing engagement, otherwise known as Meta's revenue and growth opportunities.

289.    Meta's current plans include ongoing development of what it calls the "Metaverse," which Meta plans to see integrated into fields like medicine and education, and which Meta founder and CEO Mark Zuckerberg has made clear as the key to unlocking trillions of dollars (possibly even on annual basis). In Mark Zuckerberg's own words,

a.   In October 2021, "I believe the metaverse is the next chapter for the internet."[22]

b.   In July 2022, "Zuckerberg described the metaverse as a 'huge alternative' for a number of causes, saying he feels strongly that growing metaverse platforms will 'unlock tons of billions of {dollars}, if not trillions over time.'"[23]

290.    Given the decisions Meta leadership has made with its existing products, the complete disregard for user safety and obfuscation of the truth, despite actual knowledge that its product designs were causing serious (sometimes fatal) harms to millions of children and teens, this case is not just about the harms to S.U. It is also about the unchecked power Meta's leadership will have and the very real and terrifying harms Meta leadership will cause if someone does not stand up now and hold Meta accountable.

291.    All Defendants designed their respective products to be attractive nuisances to users below the age of 13, like S.U., and failed to exercise ordinary care owed to underage business invitees to prevent the types of harms identified above.

292.    Defendants Discord, Meta, and Snap designed and chose to operate each of their respective products in a manner intended to and that does frustrate and prevent parents like C.U. from exercising her rights and duties as a parent to monitor and limit their children's use of Defendants social media products.

---

[22] *See* https://content.techgig.com/technology-unplugged/mark-zuckerberg-says-metaverse-can-become-a-1-trillion-online-economy/articleshow/87980586.cms

[23] https://cryptonewsbtc.org/2022/07/28/metas-reality-labs-loses-2-8b-in-q2-but-zuckerberg-says-it-will-unlock-billions-trillions/

293.     Defendant Roblox designed and chose to operate its product in a manner intended to and that does frustrate and prevent parents like C.U. from making informed decisions in their exercise of their rights and duties as a parent to monitor and limit their children's use of the Roblox product.

294.     All Defendants failed to warn Plaintiffs of the dangers of addiction, sleep deprivation, and/or sexual abuse occurring from and because of use of their products, and further, affirmatively misrepresented the safety, utility, and/or addictive properties of their products to minor users and their parents, including Plaintiffs in this case.

295.     S.U.'s parents have no way to keep S.U. from using Defendant Meta and Snap's products, nor can they try as they believe that any such attempt would end with S.U. self-harming, hospitalized, or worse. This is the addiction Defendants Meta and Snap have engineered for their own economic benefit, and these are among the harms Defendants Meta and Snap are causing millions of American children.

296.     In addition to the harms suffered by S.U., C.U. has suffered multiple mental, physical, and pecuniary harms as a direct result of the social media addiction and harms Defendants fostered and encouraged for their own financial gain, as described herein.

297.     In 2021 alone, S.U.'s parent went into debt by more than $10,000 for S.U.'s co-pays, which damages do not include treatment and care expenses incurred in other years and do not include countless related damages, such as time off work, decreased work performance, and food, gas, and lodging incurred to obtain treatment and help for S.U.

298.     In 2021, when C.U. could not stop S.U. from suicide attempts and self-harm and had to establish that she could protect her own child from the harms described herein, and caused by Defendants' products, C.U. had to leave her dream job. This was a government job with benefits and a pension. Currently, C.U. currently works an occasional night shift at a local restaurant to supplement her income, which is now almost non-existent and has been further impacted by the incredible, financial harms caused by Defendants' products.

299.     C.U. is still struggling to get necessary medical care for S.U., does not know how she will pay for S.U.'s past medical expenses much less her future ones, and S.U.'s education has

had to effectively be put on hold so that C.U. can keep S.U. alive.

300.     Plaintiffs are not sure what S.U.'s future will hold. For now, their family lives day-to-day, working hard to keep S.U. alive and help her get healthy.

## VI.     PLAINTIFFS' CLAIMS

## COUNT I - STRICT PRODUCT LIABILITY (Design Defect)

### (Against all Defendants)

301.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 300 as if fully stated herein.

302.     Under Restatement (Second) of Torts § 402(a) and California law, one who sells any product in a defective condition unreasonably dangerous to the user is subject to liability for physical harm thereby caused to the user if (a) the seller is engaged in the business of selling such a product, and (b) it is expected to and does reach the user or consumer without substantial change in the condition which it was sold.

303.     Defendants' products are defective because the foreseeable risks of harm posed by the product's design could have been reduced or avoided by the adoption of a reasonable alternative design by Defendants and the omission of the alternative design renders the product not reasonably safe. These defective conditions rendered these products unreasonably dangerous to persons or property and existed at the time the product left Defendants' control, reached the user or consumer without substantial change in the condition and its defective condition was a cause of Plaintiff's injury.

304.     Defendants designed, manufactured, marketed, and sold social media products that were unreasonably dangerous because they were designed to be addictive to the minor users to whom Defendants actively marketed and because the foreseeable use of Defendants' products causes mental and physical harm to minor users.

305.     Defendants' products were unreasonably dangerous because they contained numerous design characteristics that are not necessary for the utility provided to the user but are unreasonably dangerous and implemented by Defendants solely to increase the profits they derived

from each additional user and the length of time they could keep each user dependent on their product.

A.    **Inadequate Safeguards From Harmful and Exploitative Content**

306.    Facebook, Instagram, Snapchat, Roblox, and Discord are defectively designed.

307.    As designed Facebook, Instagram, Snapchat, Roblox, and Discord's recommendation and other product features are not reasonably safe because they affirmatively direct minor users to harmful and exploitative content while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that substantially distinguish between harmful and innocuous content and protect minor users from being exposed to harmful content without altering, modifying, or deleting any third-party content posted on Defendants' social media products. The cost of designing these products to incorporate this safeguard would be negligible while benefit would be high in terms of reducing the quantum of mental and physical harm sustained by minor users and their families.

308.    As designed, Facebook, Instagram, Snapchat, Roblox, and Discord's recommendations and other product features are not reasonably safe because they affirmatively direct and recommend minor users to harmful groups and other users, while failing to deploy feasible safeguards to protect vulnerable teens from such harmful exposures. It is feasible to design an algorithm and technologies that do not make harmful connection recommendations to minor users, or any connection recommendations at all; it is feasible to design and algorithm and technologies that do not recommend harmful groups to minor users, or any group recommendations at all; and it is feasible to restrict access to minor users by strangers and adult users via direct messaging, to restrict and limit such access to users already on a minor user's "friend" list, or to prevent such access altogether. Defendants know that these product features cause a significant number of harms to their minor users, such as sexual exploitation, bullying, and encouragement of self-harm and suicide.

309.    Defendants also engage in conduct, outside of the algorithms and related technologies themselves, that is designed to promote harmful and exploitative content as a means of increasing their revenue from advertisements. This includes but is not limited to efforts to

encourage advertisers to design ads that appeal to minors, including teens like S.U..; and product design features intended to attract and engage minor users to these virtual spaces where harmful ad content is then pushed to those users in a manner intended to increase user engagement, thereby increasing revenue to Defendants at the direct cost of user wellbeing.

310.    Reasonable users (and their parents) would not expect that Defendants' products would knowingly expose them to such harmful content and/or that Defendants' products would direct them to harmful content at all, much less in the manipulative and coercive manner that they do. Defendants have and continue to knowingly use their algorithms and other technologies on users in a manner designed to affirmatively change their behavior, which methods are particularly effective on (and harmful to) Defendants' youngest users.

**B.    Failure to Verify Minor Users' Age and Identity**

311.    Facebook, Instagram, Snapchat, Roblox, and Discord are defectively designed.

312.    As designed, Defendants' products are not reasonably safe because they do not provide for adequate age verification by requiring users to document and verify their age and identity.

313.    Adults frequently set up user accounts on Defendants' social media products disguising their identity and/or posing as minors to groom unsuspecting minors to exchange sexually explicit content and images, which frequently progresses to sexual exploitation and trafficking, and commercial sex acts.

314.    Minor users of social media and their parents do not reasonably expect that prurient adults set up fraudulent accounts on Defendants' social media products and pose as minors for malign purposes.

315.    Likewise, minor users whose parents have taken affirmative steps to keep them away from Defendants' products often open multiple accounts, such that Defendants know or have reason to know that the user is underage and/or does not have parental permission to use their product. Defendants already have the information and means they need to ascertain with reasonable certainty their users' actual age. Defendants utilize these tools to investigate, assess, and report on percentages and totals of underage users for internal assessment purposes. They then

choose to simply do nothing about that information as it relates to the specific, underaged users themselves.

316.    Reasonably accurate age and identity verification is not only feasible but widely deployed by online retailers and internet service providers. Defendants not only can estimate the age of their users, but they do.

317.    The cost of incorporating age and identify verification into Defendants' products would be negligible, whereas the benefit of age and identity verification would be a substantial reduction in severe mental health harms, sexual exploitation, and abuse among minor users of Defendants' products.

**C.     Inadequate Parental Control and Monitoring**

318.    Facebook, Instagram, Snapchat, Roblox, and Discord are defectively designed.

319.    Defendants have intentionally designed products to frustrate the exercise of parental responsibility by their minor users' parents. Parents have a right to monitor their children's social media activity to protect them from harm. Defendants have designed products that make it difficult, if not impossible, for parents to exercise parental responsibility.

320.    It is feasible to design a social media product that requires parental consent for users under the age of 18 and prohibits users under the age of 13.

321.    Defendants' products are also defective for lack of parental controls, permission, and monitoring capability available on many other devices and applications.

322.    Defendants' products are designed with specific product features intended to prevent and/or interfere with parents' reasonable and lawful exercise of parental control, permission, and monitoring capability available on many other devices and applications.

**D.     Intentional Direction of Minor Users to Harmful and Exploitative Content**

323.    Facebook, Instagram, Snapchat, Roblox, and Discord are defectively designed.

324.    Default "recommendations" communicated to new teenage users, including S.U., purposefully steered her toward content Defendants knew to be harmful to children of her age and gender.

//

325.    Ad content pushed to new minor users, including S.U., because of their age and vulnerability, purposefully steer those users toward content Defendants know to be harmful to children of their age and gender. This defect is only worsened by the algorithmic discrimination that exists in Defendants' products and operated to the detriment of S.U.

**E.    Design of Addictive Social Media Products**

326.    Facebook, Instagram, Snapchat, Roblox, and Discord are defectively designed.

327.    As designed, Defendants' social media products are addictive to minor users as follows: When minors use design features such as "likes" it causes their brains to release dopamine, which creates short term euphoria. However, as soon as dopamine is released, minor users' brains adapt by reducing or "downregulating" the number of dopamine receptors that are stimulated and their euphoria is countered by dejection. In normal stimulatory environments, this dejection abates, and neutrality is restored. However, Defendants' algorithms are designed to exploit users' natural tendency to counteract dejection by going back to the source of pleasure for another dose of euphoria. As this pattern continues over a period of months and the neurological baseline to trigger minor users' dopamine responses increases, they continue to use the social media products at issue, not for enjoyment, but simply to feel normal. Once they stop using these products, minor users experience the universal symptoms of withdrawal from any addictive substance including anxiety, irritability, insomnia, and craving.

328.    Addiction is not restricted to a substance abuse disorders. Rather, the working definition of addiction promulgated in the seminal article *Addictive behaviors: Etiology and Treatment* published by the American Psychological Association in its 1988 *Annual Review of Psychology* defines addiction as,

> a repetitive habit pattern that increases the risk of disease and/or associate personal and social problems. Addictive behaviors are often experienced subjectively as 'loss of control' – the behavior contrives to occur despite volitional attempts to abstain or moderate use. These habit patterns are typically characterized by immediate gratification (short term reward), often coupled with delayed deleterious effects (long term costs). Attempts to change an addictive behavior (via treatment or self-initiation) are typically marked with high relapse rate.

329.    Addiction researchers agree that addiction involves six core components: (1) salience—the activity dominates thinking and behavior; (2) mood modification—the activity

modifies/improves mood; (3) tolerance—increasing amounts of the activity are required to achieve previous effects; (4) withdrawal—the occurrence of unpleasant feelings when the activity is discontinued or suddenly reduced; (5) conflict—the activity causes conflicts in relationships, in work/education, and other activities; and (6) relapse—a tendency to revert to earlier patterns of the activity after abstinence or control.

330.    Social media addiction has emerged as a problem of global concern, with researchers all over the world conducting studies to evaluate how pervasive the problem is. Addictive social media use is manifested when a user (1) becomes preoccupied by social media (salience); (2) uses social media in order to reduce negative feelings (mood modification); (3) gradually uses social media more and more in to get the same pleasure from it (tolerance/craving); (4) suffers distress if prohibited from using social media (withdrawal); (5) sacrifices other obligations and/ or causes harm to other important life areas because of their social media use (conflict/functional impairment); and (6) seeks to curtail their use of social media without success (relapse/loss of control).

331.    The Bergen Facebook Addiction Scale (BFAS) was specifically developed by psychologists in to assess subjects' social media use using the aforementioned addiction criteria, and is by far the most widely used measure of social media addiction. Originally designed for Facebook, BFAS has since been generalized to all social media. BFAS has been translated into dozens of languages, including Chinese, and is used by researchers throughout the world to measure social media addiction.

332.    BFAS asks subjects to consider their social media usage with respect to the six following statements and answer either (1) very rarely, (2) rarely, (3) sometimes, (4) often, or (5) very often,

a.      You spend a lot of time thinking about social media or planning how to use it.

b.      You feel an urge to use social media more and more.

c.      You use social media in order to forget about personal problems.

d.      You have tried to cut down on the use of social media without success.

e.      You become restless or troubled if you are prohibited from using social media.

f.      You use social media so much that it has had a negative impact on your job/studies.

Subjects who score a "4" or "5" on at least 4 of those statements are deemed to suffer from social media addiction.

333.    Addictive use of social media by minors is psychologically and neurologically analogous to addiction to internet gaming disorder as described in the American Psychiatric Association's 2013 Diagnostic and Statistical Manual of Mental Disorders (DSM-5), which is used by mental health professionals to diagnose mental disorders. Gaming addiction is a recognized mental health disorder by the World Health Organization and International Classification of Diseases and is functionally and psychologically equivalent to social media addition. The diagnostic symptoms of social media addiction among minors are the same as the symptoms of addictive gaming promulgated in DSM 5 and include:

a.      Preoccupation with social media and withdrawal symptoms (sadness, anxiety, irritability) when device is taken away or not possible (sadness, anxiety, irritability).

b.      Tolerance, the need to spend more time using social media to satisfy the urge.

c.      Inability to reduce social media usages, unsuccessful attempts to quit gaming.

d.      Giving up other activities, loss of interest in previously enjoyed activities due to social media usage.

e.      Continuing to use social media despite problems.

  f.  Deceiving family members or others about the amount of time spent on social media.

  g.  The use of social media to relieve negative moods, such as guilt or hopelessness.

  h.  and Jeopardized school or work performance or relationships due to social media usage.

334. Defendants' advertising profits are directly tied to the quantity of their users' online time and engagement, and their algorithms and other product features are designed to maximize the time users spend using the product by directing them to content that is progressively more and more stimulative. Defendants enhance advertising revenue by maximizing users' time online through a product design that addicts them to the platform. However, reasonable minor users and their parents do not expect that online social media platforms are psychologically and neurologically addictive.

335. It is feasible to make Defendants' products not addictive to minor users by turning off the algorithms, limiting the frequency and duration of access, and suspending service during sleeping hours. Designing software that limits the frequency and duration of minor users' screen use and suspends service during sleeping hours could be accomplished at negligible cost; whereas the benefit of minor users maintaining healthy sleep patterns would be a significant reduction in depression, attempted and completed suicide, and other forms self-harm among this vulnerable age cohort.

## F. Inadequate Notification of Parents of Dangerous and Problematic Social Media Usage by Minor Users

336. Facebook, Instagram, Snapchat, Roblox, and Discord are defectively designed.

337. Defendants' products are not reasonably safe as designed because they do not include any safeguards to notify users and their parents of usage that Defendants knows to be problematic and likely to cause negative mental health effects to users, including excessive passive use and use disruptive of normal sleep patterns. This design is defective and unreasonable because:

//

338.   It is reasonable for parents to expect that social media products that actively promote their platform to minors will undertake reasonable efforts to notify parents when their child's use becomes excessive. It is feasible for Facebook, Instagram, Snapchat, Roblox, and Discord to design a product that identifies a significant percentage of their minor users who are using the product more than three hours per day or using it during sleeping hours at negligible cost.

339.   Defendants' products are not reasonably safe as designed because, despite numerous reported instances of child sexual solicitation and exploitation by adult users, Defendants have not undertaken reasonable design changes to protect underage users from this abuse, including notifying parents of underage users when they have been messaged or solicited by an adult user or when a user has sent inappropriate content to minor users.

340.   Defendants' entire business is premised upon collecting and analyzing user data and it is feasible to use Defendants' data and algorithms and other technologies to identify and restrict improper sexual solicitation, exploitation, and abuse by adult users.

341.   Moreover, it is reasonable for parents to expect that platforms such as Instagram, TikTok, and Roblox which actively promote their services to minors, will undertake reasonable efforts to identify users suffering from mental injury, self-harm, or sexual abuse and implement technological safeguards to notify parents by text, email, or other reasonable means that their child is in danger.

342.   As a proximate result of these dangerous and defective design attributes of Defendants' products, S.U. suffered severe mental harm. Plaintiff did not know, and in the exercise of reasonable diligence could not have known, of these defective design in Defendants' products until 2022.

343.   As a result of these dangerous and defective design attributes of Defendants' product, Plaintiff S.U. suffered emotional distress, physical harms and pecuniary hardship due to her daughter's mental harm resulting from her social media addiction.

344.   Defendants are further liable to Plaintiff for punitive damages based upon the willful and wanton design of its product that was intentionally marketed and sold to underage users, whom they knew would be seriously harmed through their use of Facebook, Instagram,

Snapchat, Roblox, and Discord.

## COUNT II – STRICT PRODUCT LIABILITY (Failure to Warn)

### (Against all Defendants)

345.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 344 as if fully stated herein.

346.     Defendants' products are defective because of inadequate instructions or warnings because the foreseeable risks of harm posed by these products could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe. This defective condition rendered the products unreasonably dangerous to persons or property, existed at the time the products left Defendants' control, reached the user or consumer without substantial change in the condition in which they were sold, and were a cause of Plaintiff's injuries.

347.     Defendants' products are unreasonably dangerous and defective because they contain no warning to users or parents regarding the addictive design and effects of Facebook, Instagram, Snapchat, Roblox, and Discord.

348.     Defendants' social media product rely on highly complex and proprietary algorithms and similar technologies that are both undisclosed and unfathomable to ordinary consumers, who do not expect that social media platforms are physically and/or psychologically addictive.

349.     The magnitude of harm from addiction to Defendants' product is horrific, ranging from simple diversion from academic, athletic, and face-to-face socialization to sleep loss, severe depression, anxiety, self-harm, and suicide.

350.     The harms resulting from minors' addictive use of social media platforms have been not only well-documented in the professional and scientific literature, but Defendants had actual knowledge of such harms.

351.     Defendants' products are unreasonably dangerous because they lack any warnings that foreseeable product use can disrupt healthy sleep patterns or specific warnings to parents when their child's product usage exceeds healthy levels or occurs during sleep hours. Excessive screen

time is harmful to adolescents' mental health and sleep patterns and emotional well-being. Reasonable and responsible parents are not able to accurately monitor their child's screen time because most adolescents own or can obtain access to mobile devices and engage in social media use outside their parents' presence.

352.    It is feasible for Defendants' products to report the frequency and duration of their minor users' screen time to their parents without disclosing the content of communications at negligible cost, whereas parents' ability to track the frequency, time and duration of their minor child's social media use are better situated to identify and address problems arising from such use and to better exercise their rights and responsibilities as parents.

353.    Defendants knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

354.    Defendant Roblox's products are unreasonably dangerous because they fail to provide adequate warnings to parents and minors as to the prevalence of adult users on the product as well as who the official Roblox moderators are, and likewise fail to provide adequate protections to prevent adults from misrepresenting themselves as "moderators" to minors and warnings and reporting mechanisms for children to report adults who engage them in direct messaging.

355.    It is feasible for Defendant Roblox's products to warn parents and minors against interactions with adult users and to report to parents when adult users are direct messaging minors, including time and duration of such conversations as well as the adult user's username, without disclosing the content of communications at negligible cost.

356.    Defendant Roblox knew about these harms, knew that users and parents would not be able to safely use their products without warnings, and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

357.    Defendant Discord's products are unreasonably dangerous because they affirmatively represent to minors that they are keeping them safe via their "Keep me safe" settings option which option, in fact, does nothing to keep minor users safe outside of detection of potential malware attached to images. Discord's product descriptions are deceptive and misleading, and its

products lack any warnings with regard to the fact that there is no oversight by Discord whatsoever – which warning is necessary because of Discord's representations to the contrary.

358.   It is feasible for Defendant Discord's products to provide adequate warnings and/or to ensure that their current representations are clear and not misleading to minor users. Defendant Discord knew about these harms and knew that minor users would not be able to safely use its products without warnings and failed to provide warnings that were adequate to make the product reasonably safe during ordinary and foreseeable use by children.

359.   As a result of Defendants' failure to warn, S.U. suffered severe mental harm, leading to physical injury from their use of Facebook, Instagram, Snapchat, Roblox, and Discord.

360.   As a result of Defendants' failure to warn, Plaintiff S.U. has suffered emotional distress and pecuniary hardship due to her daughter's mental harm resulting from social media addiction.

361.   Defendants are further liable to Plaintiff for punitive damages based upon their willful and wanton failure to warn of known dangers of their products that were intentionally marketed and sold to teenage users, whom they knew would be seriously harmed through their use of Facebook, Instagram, Snapchat, Roblox, and Discord.

## COUNT III – NEGLIGENCE

### (Against all Defendants)

362.   Plaintiffs realleges each and every allegation contained in paragraphs 1 through 361 as if fully stated herein.

363.   At all relevant times, Defendants had a duty to exercise reasonable care and caution for the safety of individuals using their products, such as S.U.

364.   Defendants owe a heightened duty of care to minor users of their social media products because adolescents' brains are not fully developed, which results in a diminished capacity to make good decisions regarding their social media usages, eschew self-destructive behaviors, and overcome emotional and psychological harm from negative and destructive social media encounters.

//

365.    As product manufacturers marketing and selling products to consumers, Defendants owed a duty to exercise ordinary care in the manufacture, marketing, and sale of their products, including a duty to warn minor users and their parents of hazards that Defendants knew to be present, but not obvious, to underage users and their parents.

366.    As business owners, Defendants owe their users who visit their social media platforms and from whom they derive billions of dollars per year in advertising revenue a duty of ordinary care substantially similar to that owed by physical business owners to its business invitees.

367.    Defendants were negligent, grossly negligent, reckless and/or careless in that they failed to exercise ordinary care and caution for the safety of underage users, like S.U., using their social media products.

368.    Defendants were negligent in failing to conduct adequate testing and failing to allow independent academic researchers to adequately study the effects of their products and levels of problematic use amongst teenage users. Defendants know that their products are harmful, cause extensive mental harm, and that minor users are engaging in problematic and addictive use that their parents are helpless to monitor and prevent.

369.    Defendants are negligent in failing to provide adequate warnings about the dangers associated with the use of social media products and in failing to advise users and their parents about how and when to safely use their social media platforms and features.

370.    Defendants are negligent in failing to fully assess, investigate, and restrict the use of their social media products by adults to sexually solicit, abuse, manipulate, and exploit minor users of their social media products.

371.    Defendants are negligent in failing to provide users and parents the tools to ensure their social media products are used in a limited and safe manner by underage users.

372.    As a result of Defendants' negligence, S.U. suffered severe mental harm from their use of Facebook, Instagram, Snapchat, Roblox, and Discord.

373.    As a result of Defendants' negligence, Plaintiff S.U. suffered emotional distress, physical harm, and pecuniary hardship due to her child's mental harms resulting from social media

addiction.

374.     Defendants are further liable to Plaintiff for punitive damages based upon its willful and wanton conduct toward underage users, including S.U., whom they knew would be seriously harmed through the use of their social media products.

## <u>COUNT IV – VIOLATION OF CALIFORNIA'S UNFAIR COMPETITION LAW, CAL. BUS & PROF. CODE §§ 17200, et seq.</u>

### (Against Defendants Meta and Snap)

375.     Plaintiffs reallege each and every allegation contained in paragraphs 1 through 374 as if fully stated herein.

376.     Defendants are corporations and thus each of them is a "person," as defined by California Business & Professions Code § 17201.

377.     The UCL prohibits all conduct that is unlawful, unfair, or fraudulent.

378.     Defendants' conduct is unlawful as set forth in Counts I–III, above.

379.     Defendants' conduct is unlawful also because they have knowledge of users under the age of 13 on their platforms and, in fact, actively target, market to, and encourage use of their social media products by minors under the age of 13.

380.     Defendants' conduct is unlawful also because they have knowledge of users under the age of 18 on their platforms who lack parental consent to use their products and, in fact, actively target, market to, and encourage use of their social media products by minors under the age of 18 who lack parental consent to use their products.

381.     Defendants engaged in fraudulent and deceptive business practices in violation of the UCL by promoting products to underage users, including S.U., while concealing critical information regarding the addictive nature and risk of harm these products pose. Defendants knew and should have known that their statements and omissions regarding the addictive and harmful nature of their products were misleading and therefore likely to deceive the members of the public who use Defendants' products and who permit their underage children to use Defendants' products. Had Plaintiff known of the dangerous nature of Defendants' products, they would have taken early and aggressive steps to stop or limit their daughter's use of Defendants' products.

382.    Defendants' practices are unfair and violate the UCL because they offend established public policy, and because the harm these practices cause to consumers greatly outweighs any benefits associated with them. Additionally, Defendants have designed their products to lock-in users, especially children and teens. They know that minors want to use their products and that the more minors invest in Defendants' products the harder it is for them to switch. It is hard to switch because of network effects and sunk costs, and Defendants design their products explicitly around these designs for the purpose of locking-in users. As of now, each of these defendants have locked-in the majority (possibly over 80%) of all U.S. teens aged 13 to 17 and with access to the internet. Defendants are actively working to hit 100%.

383.    Defendants' conduct has resulted in substantial injuries that Plaintiff could not reasonably have avoided because of Defendants' deceptive conduct. This substantial harm is not outweighed by any countervailing benefits to consumers or competition.

384.    As a direct and proximate result of the foregoing acts and practices, Defendants have received, or will receive, income, profits, and other benefits, which they would not have received if they had not engaged in the violations of the UCL described herein. As a direct and proximate result of the foregoing acts and practices, Defendants have also obtained unfair advantages over similar businesses that have not engaged in such practices.

385.    As a result of Defendants' UCL violations, Plaintiff has suffered injury in fact and lost money as set forth herein.

386.    Accordingly, Plaintiff seeks injunctive and equitable relief to halt and remedy Defendant's unlawful, fraudulent, and unfair conduct.

## COUNT V – UNJUST ENRICHMENT

### (Against Defendants Meta and Snap)

387.    Plaintiff realleges each and every allegation contained in paragraphs 1 through 386 as if fully stated herein.

388.    As a result of Defendants' conduct detailed herein, Defendants received a benefit. Because Defendants' advertising profits are directly tied to the number of user accounts and the amount of time those users spend on Instagram, Defendants benefited directly from S.U.'s

problematic use of their products, both from the amount of time she spent on Defendants' products.

389.    It would be unjust and inequitable for Defendants to retain the ill-gotten benefits at Plaintiff's expense, in light of Defendants' acts and omissions described herein.

390.    Accordingly, Plaintiff seeks damages in an amount to be proven at trial.

## COUNT VI – INVASION OF PRIVACY

### (California Constitutional Right to Privacy, Cal. Const. Art. 1, § 1)

### (Against Defendants Meta and Snap)

391.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 390 as if fully stated herein.

392.    Defendants Meta and Snap intentionally intruded upon Plaintiff's solitude, seclusion, or private affairs by knowingly designing their product with features that were intended to, and did, frustrate parents' ability to monitor and control their children's social media usage.

393.    These intrusions are highly offensive to a reasonable person, particularly given Defendants' interference with the fundamental right of parenting and its exploitation of children's special vulnerabilities for commercial gain.

394.    Plaintiff wase harmed by Defendants' invasion of privacy, as detailed herein.

395.    Plaintiff therefore seeks compensatory and punitive damages in amounts to be determined at trial, as well as injunctive relief requiring Defendants to cease the harmful practices described throughout this complaint.

## COUNT VII – VIOLATION OF 18 U.S.C. § 1595 and 1591

### (Against Defendant Snap)

396.    Plaintiffs reallege each and every allegation contained in paragraphs 1 through 395 as if fully stated herein.

397.    Plaintiff brings claims under 18 U.S.C. § 1595 based on Defendant Snap's financial benefit garnered from knowingly assisting, supporting, and facilitating the sexual solicitation and exploitation of S.U. for commercial sex acts. Defendant knowingly used the instrumentalities of interstate commerce to violate 18 U.S.C. § 1591. Defendant knowingly received something of value from participation in a venture which recruits or entices a person knowing, or in reckless

disregard of the fact, that S.U. had not attained the age of 18 years and was caused to engage in a commercial sex act as defined by 18 U.S.C. § 1591(a).

398.    Defendant Snap is aware of, and knowingly benefits, from the large number of predatory users who regularly use Defendant's product to solicit and groom minor users such as S.U. into sexually compromising situations and lure them into being sexually exploited and trafficked for the purposes of commercial sex acts as defined in 18 U.S.C. § 1591.

399.    Defendant Snap is aware of, and knowingly facilitates the solicitation and grooming of minor users such as S.U. for purposes of commercial sex acts as defined in 18 U.S.C. § 1591, including by providing minors and predators with a unique product feature that allows them to hide explicit photographs and videos from parents and law enforcement. These are explicit and illegal photos and videos they otherwise would not retain and, as such, would not be able to distribute or sell to others; as well as explicit and illegal photos and videos that would be used by parents and/or law enforcement to put a stop to such abuses but for use of the My Eyes Only product.  In S.U.'s case, My Eyes Only operated in both regards.

400.    Defendant Snap had actual knowledge or recklessly disregarded the fact that S.U. was under the age of 13 based on information it collected about her, and repeated statements made on Snapchat—including to adult men with whom she was exchanging sexually explicit material—that she was underage. Defendant also had actual knowledge that the men with whom she was communicating on its platform were adults based on information it collected about those users. Defendant's technology provided it with actual knowledge that S.U. was being solicited for and was exchanging sexually explicit photographs and video with adult men in a manner that constituted commercial sex acts under 18 U.S.C. § 1591. In fact, Defendant itself publicly represents that it has and uses this technology, including in the case of minor Snapchat users.

401.    Defendant Snap has designed and marketed its product in such a way as to appeal to and make clear that predatory users may use its product for these illegal purposes. It has knowledge of and/or has recklessly disregarded these harms for its own financial benefit. This includes, for example, Snapchat's development and marketing of disappearing messages, which provides bad actors with a false sense of security that they cannot get caught and incentives minors

to act in ways they otherwise would not – in S.U.'s case, she did not exchange explicit photos or videos on other platforms for fear that the photo or video would remain in circulation. She did not have this fear in the case of the Snapchat product, however, and precisely because of Defendant Snap's advertising and marketing of its product.

402.    Defendant Snap has also developed a product called "My Eyes Only," which is a unique and uniquely dangerous when it comes to sexual predators and other bad actors, and exploitation and harm to minors on social media. My Eyes Only serves the singular purpose of allowing minors and adults seeking to hide illegal activity with a self-destructing data vault. The user need not even initiate destruction of the data stored therein, as such destruction occurs (on information and belief) upon inputting of an incorrect passcode. This product feature serves no purpose other than engagement and locking-in of bad actors and minors to Snap's social media product, as evidenced by the fact that the owner of a device can simply use their device passcode to store and keep data private from others. This is an incredibly dangerous product that not only appeals to and makes clear that predatory users may use Snapchat for these illegal purposes, but actively encourages them to do so in a way no other social media product does.

403.    On information and belief, Snapchat's My Eyes Only product is used to store illicit and illegal Child Sexual Abuse Material (CSAM) both for personal use and to facilitate the sexual solicitation and exploitation of minors for commercial sex acts. Only S.U.'s abuser and Snap knows whether Snap's product was used for those purposes here, however, Plaintiff alleges that such use is likely given the known violations of 18 U.S.C. § 1591 and 1595 facilitated through and because of the Snapchat social media product and the design and common use of My Eyes Only.

404.    Defendant Snap knows that My Eyes Only is an inherently dangerous product, and that is serves no utility and has no value outside of providing users with a means to store and quickly dispose of illicit and illegal materials that they either cannot store on their personal devices (for example, because they are minors) or can store on their personal devices but would then be subject to legal process and discovery (for example, because they are exploiting and abusing minors and causing them to engage in a commercial sex acts as defined by 18 U.S.C. § 1591(a)).

405.    Many of Defendant Snap's users are sexual predators—adults who use Defendants'

products to prey on underage children, including children as young as S.U., who was under 13 when she started using Snap's products. Snap knows or has reason to know that many of its users are sexual predators, and instead of discouraging those users, Snap encourages them through its marketing of disappearing messages and products like My Eyes Only.

406.    Defendant Snap's greatest source of revenue comes from advertisements. Defendant is paid in direct correlation to how much time a user stays on its Snapchat product. Defendant lacks the financial incentive to create products that deny access to underage users and, likewise, Defendant makes money each time a predatory user starts using its social media product and makes that their go-to social media product and each time a predatory user solicits, exploits, or otherwise engages young children through its social media platform.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs prays for judgment against S.U. for monetary damages for the following harms:

1. Past physical and mental pain and suffering of S.U., in an amount to be more readily ascertained at the time and place set for trial.

2. Loss of future income and earning capacity of S.U.

3. Past and future medical expenses of S.U.

4. Past physical and mental pain and suffering of S.U., in an amount to be more readily ascertained at the time and place set for trial.

5. Monetary damages suffered by C.U.

6. Punitive damages.

7. For the reasonable costs and attorney and expert/consultant fees incurred in this action.

8. For injunctive relief, including but not limited to prohibiting each of the following,

a) Distribution of the Instagram, Snap, Roblox, and Discord products to any user without proof of identity or, in the case of users under the age of 18, proof of consent by a parent or guardian.

b) Distribution to any user under the age of 18 without also obtaining a verified email address and phone number for the user's parent or guardian.

c) Distribution to any user under the age of 18 where a parent or guardian has provided written (including email) notice that their child does not have permission to use Defendants' social media product (also requiring Defendants to provide a physical and email address where notices can be sent).

d) Use of algorithms and similar technologies to identify, suggest, direct, or provide unsolicited content to any user under the age of 18.

e) Use of algorithms and similar technologies to rank or order any content shown to any user under the age of 18 except via objective and transparent methods, for example, ranking in chronological order.

f) Distribution of any product that is suspected to or does operate with any degree of algorithmic discrimination where such discrimination would foreseeably impact any member of any protected class.

g) Use of any direct messaging product in connection with any minor user and without parental knowledge, consent, and notification as to all such messaging activity of their minor child.

h) Marketing to any person under the age of 18.

i) For users under the age of 18, any setting that makes the account public or in any way visible to any person not specifically "connected" to the user.

j) For users under the age of 18, any setting or tool through which communication is allowed with any person not already "connected" to the minor user. This includes but is not limited to things like Messenger, Direct Messaging, Snaps, and similar direct communication features.

k)  Use of any push notifications or reminders or other notifications relating to activity taking place on social media.

l)  Sending of any communication to any user under the age of 18 that is not also sent to that user's parent or guardian.

9.  Such other and further relief as this Court deems just and equitable.

DATED this 4th day of October, 2022.

SOCIAL MEDIA VICTIMS LAW CENTER PLLC

By: _____

Laura Marquez-Garrett (SBN 221542)
laura@socialmediavictims.org
Matthew P. Bergman *(Pro Hac Vice anticipated)*
matt@socialmediavictims.org
Glenn Draper *(Pro Hac Vice anticipated)*
glenn@socialmediavictims.org
SOCIAL MEDIA VICTIMS LAW CENTER
821 Second Avenue, Suite 2100
Seattle, WA 98104
Tel: (206) 741-4862   Fax: (206) 957-9549

WATERS KRAUS & PAUL
Kevin M. Loew (SBN 238080)
kloew@waterskraus.com
222 North Pacific Coast Hwy, Suite 1900
El Segundo, California 90245
Tel: (310) 414-8146   Fax: (310) 414-8156

Christopher A. Seeger *(Pro Hac Vice anticipated)*
cseeger@seegerweiss.com
Christopher Ayers *(Pro Hac Vice anticipated)*
cayers@seegerweiss.com
SEEGER WEISS
55 Challenger Road
Ridgefield Park, NJ 07660
Tel: (973) 639-9100   Fax: (973) 679-8656

Robert H. Klonoff *(Pro Hac Vice anticipated)*
klonoff@usa.net
ROBERT KLONOFF, LLC
2425 S.W. 76th Ave.
Portland, Oregon 97225
Tel: (503) 702-0218   Fax: (503) 768-6671

Attorneys for Plaintiff